**STATE of Iowa, Appellant,**

v.

**Monte Wendell SEAGER, Appellee.**

No. 96–1328.

Supreme Court of Iowa.

Oct. 22, 1997.

Rehearing Denied Nov. 25, 1997.

Thomas J. Miller, Attorney General, Ann E. Brenden and James Kivi, Assistant Attorneys General, and Michael A. Riepe, County Attorney, for appellant.

Linda Del Gallo, State Appellate Defender, and John P. Messina, Assistant State Appellate Defender, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, NEUMAN, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

Defendant, Monte Seager, has been charged twice for the 1978 murders of Clementine Beavers and her daughter, Karol. The first charge was dismissed in 1984, after the district court had suppressed the alleged murder weapon because the search warrant under which it had been seized lacked probable cause. After a second warrant was obtained and executed in 1993 to seize the same weapon, Seager was again charged with two counts of first-degree murder. Seager again filed a motion to suppress the weapon and related evidence. The district court ruled principles of collateral estoppel prevented the State from relitigating the admissibility of the weapon, and because the testing of the weapon was a fruit of its illegal seizure, results of that testing were also inadmissible. This court granted the State's request for an interlocutory appeal. We reverse.

## I. *Background Facts and Proceedings.*

On October 30, 1978, Max Beavers discovered the bodies of his wife, Clementine Beavers, and his seventeen-year-old daughter, Karol Beavers. Both had died of gunshot wounds to the head; Karol Beavers had been sexually assaulted. The authorities quickly identified the type of bullet that had killed the victims, .22 caliber manufactured by CCI, and the rifling pattern left on the bullets. Five weapons were identified as capable of firing the bullets, one of which was a Mossberg rifle.

On November 2, 1978, the authorities interviewed Seager, a classmate of Karol Beavers. Seager told the police he watched television and went to bed the night of the murders. (His father and stepmother, with whom he lived, could not corroborate this alibi.) Seager acknowledged he owned a .22 caliber Mossberg magnum rifle, a fact confirmed by Seager's stepmother and firearm records documenting her purchase of the gun for Seager. Seager also stated he target-practiced with the Mossberg rifle near Saunders Park.

In April of 1979, Susan Wheelock was badly beaten and later that month died of her injuries. The authorities suspected Seager of this crime, and on April 16, 1979, executed a search warrant at Seager's residence to obtain evidence in the Wheelock murder. Agents for the Department of Criminal Investigation (DCI) observed the Mossberg rifle and CCI ammunition at the residence, but did not seize these items. (Seager was subsequently convicted of the second-degree murder of Wheelock.)

On July 11, 1979, and again on July 26, 1979, the authorities executed search warrants at the Seager residence to search for evidence in the Beavers murders. The Mossberg rifle and the CCI ammunition were seized during the latter search. On August 6, 1979, a hearing was held on return of the July 26, 1979, search warrant; no one claimed the property seized. (Seager was incarcerated continuously from mid-April 1979 for the Wheelock murder.)

The authorities continued to investigate the Beavers murders subsequent to their seizure of Seager's rifle, and between August 10, 1979, and January 30, 1981, learned additional facts incriminating Seager: (1) saliva left on Karol Beavers' breast was from an "O" type secretor and Seager is an "O" type secretor; (2) Seager's father said Seager had used nonmagnum .22 caliber ammunition in the Mossberg rifle;[1] (3) Seager's brother confirmed that he and Seager had shot the rifle at the park and the city dump; (4) results of the ballistics tests on the rifle revealed the rifling pattern on the bullets from that rifle were consistent with the rifling pattern on the bullets recovered from the victims; (5) Seager's stepmother reported that Seager stayed home sick the day after the murders and she saw him burn something that afternoon that looked like clothing; (6) Seager provided authorities with a map showing exactly where in Saunders Park he and his brother shot targets; (7) ballistics tests on bullets recovered from telephone poles in Saunders Park showed that three of the bullets were of the same type as those recovered from the murder victims (CCI .22 caliber long-rifle) and that one bullet had been fired from the same gun that fired the bullet taken from Clementine

---

1. The bullets recovered from the victims' bodies were nonmagnum .22 caliber rifle bullets.

Beavers' body; and (8) Seager's brother took the authorities to the target-shooting site to confirm that the recovered bullets were extracted from the telephone poles where he and Seager target practiced.

In August 1981, the grand jury indicted Monte Seager in the murders of Clementine and Karol Beavers. Seager filed a motion to suppress the Mossberg rifle and ammunition and the subsequent ballistics testing of those items, claiming the July 26, 1979 search warrant was invalid.[2] The district court's suppression of this evidence was upheld on appeal. *State v. Seager*, 341 N.W.2d 420, 432 (Iowa 1983). Upon remand of the case to the district court, the charges against Seager were dismissed without prejudice.

The State then filed an application for an order determining the disposition of the seized property. Finding no claims of ownership or claims for return of the property, the district court ordered the Mossberg rifle and ammunition forfeited to the State for disposition pursuant to Iowa Code section 691.9 (1983).[3]

On July 26, 1993, fourteen years to the day after execution of the first search warrant, the State obtained and executed a second search warrant to seize the Mossberg rifle from the Iowa Highway Patrol office in Mt. Pleasant, where the rifle had been stored since its forfeiture to the State in 1984. Upon obtaining the rifle, new ballistics tests were conducted. These tests confirmed that the Mossberg rifle fired the bullet that killed Clementine Beavers.

Seager was again charged with two counts of first-degree murder. He moved to suppress the rifle and any fruits of the illegal 1979 search. The district court ruled the rifle itself could not be used as evidence because the admissibility of the rifle had

already been determined adversely to the State in the prior action and principles of collateral estoppel prevented the State from relitigating that issue in this action. The district court also suppressed the ballistics testing of the rifle done after the 1993 seizure, ruling it was a fruit of the illegal 1979 search. Seager's request to suppress the information gained by the State from its interviews of his stepmother, his father and his brother was denied. The district court held the investigation of Seager as the possible murderer, including whether Seager's .22 caliber Mossberg rifle was the murder weapon, was in progress before the 1979 seizure of the rifle. Because this ongoing investigation, not the 1979 seizure of the rifle, led to interviews of the challenged witnesses and because the 1979 seizure and testing did not influence the authorities in their questioning of these witnesses, their testimony was untainted by the illegal seizure. We granted the State's request for discretionary review of the district court's ruling.[4]

## II. *Scope of Review.*

■ The suppression of the rifle and related ballistics testing rested on the district court's determination that the seizure of Seager's rifle violated the Fourth Amendment. *See* U.S. Const. amend. IV (prohibiting unreasonable searches and seizures). We review this constitutional claim de novo. *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997). In doing so, we independently evaluate the totality of the circumstances shown in the record. *State v. Brecunier*, 564 N.W.2d 365, 367 (Iowa 1997).

## III. *Collateral Estoppel.*

■ The district court suppressed the rifle because it concluded "the doctrine of collateral estoppel bars relitigation of the admissibil-

---

**2.** Although the July 26, 1979 search warrant was the fourth warrant executed at the Seager residence in 1979, we are concerned here only with the July 26 warrant and the effect of its illegality on a search warrant executed in 1993. Consequently, in the remainder of this opinion, we refer to the July 26, 1979 warrant as the first warrant or the 1979 warrant.

**3.** Section 691.9 provided in relevant part, "Ammunition and firearms forfeited to the state may

be destroyed, *retained,* given to or exchanged with other public agencies, within or without the state." Iowa Code § 691.9(2) (1983) (emphasis added).

**4.** The defendant did not cross-appeal from the district court's partial denial of his motion to suppress. Accordingly, we review only the admissibility of the rifle and the results of the 1993 ballistics testing on the rifle.

ity of the weapon." Collateral estoppel or issue preclusion "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970). An "ultimate fact" is a "question[ ] of fact essential to the prior judgment." *State v. Stergion*, 248 N.W.2d 911, 913 (Iowa 1976).

Four conditions must be met for collateral estoppel or issue preclusion to apply:

(1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981). The defendant bears the burden to show the existence of the prerequisites for application of the collateral estoppel doctrine. *State v. Butler*, 505 N.W.2d 806, 809 (Iowa 1993).

We think Seager has failed to demonstrate the existence of the first element: "the issue decided in the prior trial [is] precisely the same issue presented in the pending action." *State v. Sunclades*, 305 N.W.2d 491, 495 (Iowa 1981). Seager argues the issue with which we are concerned is the admissibility of the rifle, the same issue in the prior case. The State argues the issue presently before the court is the validity of the 1993 warrant, whereas the issue in the prior proceeding was the validity of the 1979 warrant. We agree with the State's characterization of the issues because that characterization is consistent with our prior cases dealing with the identity of issues for purposes of issue preclusion.

In *In re Marriage of Guyer*, 522 N.W.2d 818 (Iowa 1994), the petitioner sought a modification of her former husband's child support obligation. 522 N.W.2d at 820. The original support figure had been set by the court in an amount less than that required by the child support guidelines. *Id.* The petitioner argued there was a substantial change in circumstances warranting a modification of this figure. *Id.* She relied on a statute stating a substantial change of circumstances exists when the child support varies by more than ten percent from the guidelines' amount. *Id.* at 821. The obligor argued the court had previously approved the deviation from the guidelines' amount and consequently principles of issue preclusion prevented the petitioner from relitigating the wisdom of that deviation. *Id.*

We concluded issue preclusion did not apply because the issue in the modification proceeding was not identical to the issue in the original action. *Id.* We stated the determination of the appropriate level of support in the modification action depended on the parties' *current* income, income that was substantially different from the parties' income at the time of the dissolution. *Id.* We held, therefore, that the issue in the modification action was not the same as the issue in the prior proceeding. *Id.*

We took a similar approach in *Amro v. Iowa District Court*, 429 N.W.2d 135 (Iowa 1988). The *Amro* case involved a series of contempt citations for the plaintiff father's failure to return his minor son to the United States and the custody of the child's mother as required by various court orders. *Amro*, 429 N.W.2d at 136–38. On February 10, 1987, an order was entered placing temporary custody of the child with the mother and requiring the father to return the child to the mother by February 23, 1987. *Id.* at 137. When the child was not returned, a contempt hearing was held in August 1987. *Id.* The district court held there was no contempt proven because the court could not conclude beyond a reasonable doubt that the father's failure to return the child was accomplished by design on his part. *Id.*

In November 1987, a decree was entered dissolving the parties' marriage, awarding the mother custody of the child (who remained abroad), and requiring the father to deliver the child to the mother. *Id.* In February 1988, the father was held in contempt for failing to return the child to the child's mother as required by the dissolution decree.

*Id.* at 138. On appeal of that contempt conviction, the father argued his 1988 contempt conviction was barred by the doctrine of issue preclusion, claiming the same issue had been resolved in his favor in the August 1987 contempt proceeding. *Id.* at 139–40. This court disagreed and held the issues in the two proceedings were not identical:

> The finding of contempt in February 1988 dealt with a court order and many facts that were not in existence in August 1987. Because the hearings involved facts and issues that were not identical, issue preclusion ... do[es] not prevent the enforcement of the February 1988 order.

*Id.* at 140; *accord Cornell v. State*, 529 N.W.2d 606, 610 (Iowa App.1994) ("Identity of issues requires the same facts and legal standards be used to resolve the issues.").

The same rationale applies here. Whether the Mossberg rifle was admissible in the prior action depended on the validity of the 1979 search warrant. Whether the rifle is admissible in the pending action depends on the validity of the 1993 search warrant. As our subsequent discussion will illustrate, resolution of this latter issue hinges on many facts that were not known by the authorities when they obtained and executed the 1979 warrant. To paraphrase *Amro*, the suppression order in 1996 dealt with a search warrant and many facts that were not in existence in July 1979. Because the suppression hearings involved facts and issues that were not identical, issue preclusion does not prevent litigation of the validity of the 1993 seizure. *See Amro*, 429 N.W.2d at 140; *Universal Coops., Inc. v. Tasco, Inc.*, 300 N.W.2d 139, 142–44 (Iowa 1981) (holding principles of issue preclusion did not bar a party from attempting to serve process on the defendant after an unsuccessful attempt to serve the defendant by another method).

### IV. *Waiver.*

■ Before we examine the validity of the 1993 search warrant, we consider Seager's contentions that the State has waived any argument that the rifle is admissible under an exception to the exclusionary rule because (1) these arguments were not made in the 1982 suppression hearing, and (2) the State delayed in refiling the charges against him. We measure these contentions against the standard definition of "waiver": the intentional relinquishment of a known right. *See State v. Wallace*, 475 N.W.2d 197, 200 (Iowa 1991); *Black's Law Dictionary* 1580 (6th ed.1990).

■ A. *Failure to argue exceptions in first proceeding.* Seager argues the State cannot rely on an exception to the exclusionary rule to validate the 1993 warrant because "[t]he State could have advanced the same arguments it makes today in the 1982 proceedings in the district court, and/or in the discretionary review proceedings that followed in this Court." We do not think the State has waived any exception to the exclusionary rule in this action by not making similar arguments in the prior proceeding.

As we have already decided, the prior suppression ruling involved a different warrant issued on different facts than the warrant before us. That the legal standards and relevant facts *overlap* does not render the issues *identical.* Consequently, we do not think the failure to raise a particular argument in the prior proceeding operates as a waiver of that argument in this later case involving a different issue.

B. *Delay.* Seager has failed to explain how a mere delay in asserting one's rights operates as an intentional relinquishment of those rights. There is no statutory bar to the State's 1996 trial information charging Seager with two counts of murder in the first degree. *See* Iowa Code § 802.1 ("A prosecution for murder in the first or second degree may be commenced at any time after the death of the victim."). Nor does the equitable doctrine of laches apply.

■ Laches will bar an action when there has been an unreasonable delay in asserting a right that causes prejudice to another. *State v. Peterson*, 347 N.W.2d 398, 404 (Iowa 1984). The party relying on this doctrine bears the burden of proving its elements by clear and convincing evidence. *Id.* Here, Seager has identified no prejudice to him as a result of the State's delay in reseizing the rifle. We will not infer prejudice simply from the passage of time. *Cullinan*

*v. Cullinan,* 226 N.W.2d 33, 36 (Iowa 1975). Because no prejudice has been shown, the doctrine of laches does not apply. *See Peterson,* 347 N.W.2d at 404 (refusing to apply laches where the defendant proved no prejudice).

Although Seager does not expressly claim a due process violation by the State's delay in filing the present charges, he does argue the State was required to pursue the criminal charges against him with due diligence. *See State v. Trompeter,* 555 N.W.2d 468, 471 (Iowa 1996) (finding pre-accusatorial delay violated defendant's due process rights). As we noted in *Trompeter,* however, "[t]here is no constitutional right to be arrested and charged at the precise moment probable cause comes into existence." *Id.* at 470. Only where "the government delays filing charges to intentionally 'gain [a] tactical advantage over the accused' " are due process rights implicated. *Id.* (quoting *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468, 481 (1971)). We held in *Trompeter* that the defendant had to prove "(1) the delay was unreasonable[,] and (2) the defendant's defense was thereby prejudiced." *Id.* As we have already decided, Seager has failed to prove he was prejudiced by the State's delay in refiling the murder charges against him. Consequently, Seager cannot rely on a due process violation to support his claim of waiver. *See State v. Florie,* 411 N.W.2d 689, 693–94 (Iowa 1987) (finding no due process violation where there was a seven-year delay between original charges and refiled charges, in part because there was no proof of actual prejudice to the defendant) (citing *State v. Hall,* 395 N.W.2d 640, 643–44 (Iowa 1986)).

In the absence of evidence the State intended to relinquish its right to reseize the rifle, we will not find a waiver based solely on its delay in pursuing the charges against Seager. Consequently, we reject Seager's waiver argument.

### V. *Legality of the 1993 Search Warrant.*

Seager argues, and the district court ruled, that the illegal 1979 search tainted the 1993 warrant, rendering the second search and seizure illegal. The State asserts the 1993 warrant is valid because it was obtained through a demonstration of probable cause independent of and untainted by the 1979 search. As we consider these contentions, it is helpful to keep in mind not only the applicable legal principles, but the rationales underlying them as well.

A. *The exclusionary rule and its exceptions.* The Fourth Amendment requires that a search warrant be supported by probable cause. U.S. Const. amends. IV, XIV, § 1. "Probable cause to search requires a probability determination that '(1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched.' " *Gogg,* 561 N.W.2d at 363 (quoting *United States v. Edmiston,* 46 F.3d 786, 789 (8th Cir.1995)).

Where a warrant is not supported by probable cause, any evidence seized pursuant to that warrant must be suppressed. *See Seager,* 341 N.W.2d at 428 (suppressing evidence seized pursuant to a warrant that lacked probable cause). Additionally, "testimony concerning knowledge acquired during an unlawful search" is inadmissible. *Murray v. United States,* 487 U.S. 533, 536, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472, 480 (1988). Not only is the illegally-obtained evidence suppressed, but "derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search" is subject to exclusion. *Id.* at 536–37, 108 S.Ct. at 2533, 101 L.Ed.2d at 480.

The exclusionary rule is designed to deter illegal police conduct. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 386–87 (1984). It applies to evidence gained indirectly as well as directly through unconstitutional conduct to ensure the prosecution is not "put in a better position than it would have been in if no illegality had transpired." *Id.* at 443, 104 S.Ct. at 2508, 81 L.Ed.2d at 387.

Evidence obtained illegally does *not,* however, "become sacred and inaccessible." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183,

64 L.Ed. 319, 321 (1920). "[I]f the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint,'" the evidence is not excluded. *Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599, 608 (1984) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939)). For example, it is possible to remove the taint of a prior illegality by obtaining the same information or evidence through means independent of the illegal conduct. *Silverthorne,* 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321; *State v. Hamilton,* 335 N.W.2d 154, 158 (Iowa 1983). Similarly, if the evidence "ultimately or inevitably would have been discovered by lawful means," the exclusionary rule serves no purpose and does not apply. *Williams,* 467 U.S. at 444, 104 S.Ct. at 2509, 81 L.Ed.2d at 387–88 (adopting the inevitable discovery rule).

These exceptions to the exclusionary rule are based on the belief

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position [than] they would have been in if no police error or misconduct had occurred.

*Id.* at 443, 104 S.Ct. at 2509, 81 L.Ed.2d at 387 (emphasis in original). Thus, if the police have obtained or would have obtained evidence through a source unrelated to the illegality, the challenged evidence is admissible because to exclude such evidence would "put the police in a worse position than they would have been in absent any error or violation." *Id.*

We think it helpful at this point to contrast these principles of law with Seager's belief that there is something inherently wrong with the State's attempt to cleanse the rifle of the taint of its earlier illegal seizure. The Supreme Court has specifically held that the government may reseize evidence previously seized illegally when the later seizure is pursuant to a warrant issued on facts and for reasons independent of the initial illegality. *Murray,* 487 U.S. at 541–42, 108 S.Ct. at 2535, 101 L.Ed.2d at 483 (government conducted an illegal, warrantless seizure, but later reseized the evidence pursuant to a warrant obtained on the basis of information gained independently of the illegal search and seizure). Thus, Seager's belief that the State simply should not be able to do what it is attempting to do is inconsistent with the principles of law we must apply in this case.

We now summarize the governing legal principles. The philosophy underlying the exclusionary rule and its exceptions is *to put the parties in the same position as if the illegal police conduct had not occurred.* The exclusionary rule ensures the prosecution does not gain an advantage from the illegality that it would not otherwise have had. In this way, the rule discourages illegal police conduct. On the other hand, the exceptions to the exclusionary rule assure the prosecution is not put in a worse position than it would have been in had the police misconduct not occurred. These exceptions limit the sweep of the exclusionary rule in recognition of the "enormous price [exacted] from society and our system of justice" by suppressing relevant information. *Segura,* 468 U.S. at 816, 104 S.Ct. at 3391, 82 L.Ed.2d at 616. We keep in mind these competing interests and the delicate balance achieved by the exclusionary rule and its exceptions as we analyze the validity of the 1993 search warrant.

■■■ B. *Connection of rifle to criminal activity.* As noted above, the first prong of probable cause is a determination that the items sought are connected to criminal activity. The application for the 1993 search warrant indisputably established probable cause to believe the Mossberg rifle was connected to criminal activity, the Beavers murders. The application contained a recitation of the results of the DCI investigation including (1) Seager owned a Mossberg rifle that was one of five weapons capable of shooting bullets with the class characteristics of the bullets taken from the victims, (2) Seager was a type "O" secretor and saliva on one of the victims was from a type "O" secretor, and (3) ballistics tests on bullets recovered from the target-shooting site used by Seager showed one

of the recovered bullets was shot by the murder weapon.[5]

We agree with the district court's conclusion that the DCI investigation leading to this information was not prompted by the illegal seizure of the rifle or its subsequent testing. By July 26, 1979, the authorities had clearly focused on Seager as a suspect in the Beavers murders. There is no evidence to suggest the DCI investigation of Seager's possible connection to the murders would have been abandoned had the authorities not seized Seager's rifle in July of 1979.

We conclude the first prong of the probable-cause test is established by evidence obtained from an independent source—the ongoing DCI investigation—untainted by the 1979 illegal search. We now turn to the second prong of the probable-cause requirement.

C. *Location of the item to be seized at the place to be searched.* The authorities first learned of the location of the Mossberg rifle owned by Seager in April of 1979 when they saw it at his residence during execution of the Wheelock search warrant. After the State's July 1979 seizure of the weapon and its subsequent suppression, the first criminal action was dismissed. Because no one came forward to claim the rifle, it was forfeited to the State in 1984. Thereafter, the rifle was lawfully retained by the DCI in its evidence room located at the state patrol post in Mt. Pleasant. The application for the search warrant stated the rifle would be found at that location.

 Seager argues the second prong of the probable-cause requirement is tainted by the 1979 search because "the State's fourteen-year possession of the evidence is fatal to the State's claim of independence." The district court agreed with this contention,

finding the State was able to locate Seager's rifle in 1993 only because of the illegal 1979 search and seizure. Upon our de novo review, we conclude for several reasons that the taint of the illegal search is so attenuated that it does not invalidate the 1993 warrant.

1. *Seager's failure to claim the rifle after the dismissal of the first charges.* The State had possession of the rifle in 1993 because Seager did not claim the rifle upon dismissal of the first charges. Thus, although the State originally came into possession of the rifle due to its illegal seizure, the State *remained in possession* of the rifle for reasons totally *unrelated* to the 1979 search; Seager was unable to claim the rifle at the forfeiture hearing because he was by then imprisoned for the murder of Susan Wheelock. Furthermore, the State could not have returned the rifle to Seager because, as a felon, he was prohibited from possessing a firearm. *United States v. Jeffers,* 342 U.S. 48, 53–54, 72 S.Ct. 93, 96, 96 L.Ed. 59, 65 (1951) (holding defendant was not entitled to return of illegally seized narcotics because possession of narcotics was illegal); *see* Iowa Code § 724.26 (1983) (prohibiting possession of firearm by a felon).

To allow Seager to prolong the taint of the illegal seizure by not claiming the rifle in 1984 would create an unassailable loophole for defendants. A defendant could virtually ensure that evidence illegally seized from him could never be used against him because the State would be unable to remove the taint of the illegal search so long as the evidence remained in the State's possession. Even if the State transferred the evidence to another public entity, as permitted by section 691.9(2), the ultimate location of the evidence would always be traceable to the State's initial unlawful seizure of the evidence.

**5.** Seager points out that the affidavit supporting the application for the second warrant also included a recitation that the rifle had previously been seized from the Seager residence under an illegal warrant. He claims this statement shows the State used illegally-obtained information to secure the second warrant. Accepting Seager's argument that knowledge of the 1979 seizure of the rifle is tainted information, we simply excise it from the affidavit in considering whether probable cause exists independently of information gained from the 1979 search. *See United States v. Whitehorn,* 829 F.2d 1225, 1231 (2d Cir.1987) (" '[T]he ultimate inquiry ... is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.' ") (citations omitted); *Seager,* 341 N.W.2d at 425 (determining existence of probable cause in the absence of challenged statement).

To apply the exclusionary rule in the manner suggested by Seager would put the State in a *worse* position than if the illegal search had not occurred—a result clearly at odds with the underlying philosophy of the exclusionary rule. *See Williams,* 467 U.S. at 445, 104 S.Ct. at 2510, 81 L.Ed.2d at 388 (rejecting application of exclusionary rule that would have put the police in a worse position, noting the "enormous societal cost of excluding truth in the search for truth"). Therefore, we hold the defendant's failure to reclaim the rifle for reasons unrelated to the 1979 search and seizure removes the taint from the State's possession of the rifle.

2. *The State's pre-illegality knowledge of the location of the rifle.* Before the 1979 search, the authorities knew or were at least reasonably certain of the location of the rifle because DCI agents saw the Mossberg rifle and the CCI ammunition at the Seager residence three months *earlier* during execution of a valid search warrant in the Wheelock murder investigation. The deficiency in the State's probable-cause showing for the first warrant went to the rifle's connection to the murders, not its location.

Under Seager's interpretation of the exclusionary rule the State's *untainted* knowledge of the weapon's location becomes tainted because of the illegal seizure and resulting possession of the rifle by the State. Thus, the State would be in a *worse* position because of the illegal search than it would have been in had the search not occurred—a result clearly not contemplated by the exclusionary rule. *See Murray,* 487 U.S. at 541, 108 S.Ct. at 2535, 101 L.Ed.2d at 483 (rejecting application of exclusionary rule where it "would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one") (emphasis in original).

We note the United States Supreme Court has expressly anticipated that the taint of an illegal search and seizure could be removed by a later search and seizure *even when the police retain the seized evidence.*

It seems to us, however, that *reseizure of tangible evidence already seized* is no more impossible than rediscovery of intangible evidence already discovered. The independent source doctrine does not rest upon such metaphysical analysis, but upon the policy that, while the government should not profit from its illegal activity, *neither should it be placed in a worse position than it would otherwise have occupied.* So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

*Id.* at 542, 108 S.Ct. at 2535, 101 L.Ed.2d at 483 (emphasis added). The implicit premise of the Court's discussion about reseizure of evidence is that, although it may be difficult to establish an independent source where the police retain the seized evidence, it is not impossible. Because the Court clearly anticipated that a valid reseizure could occur, the location of the evidence in the hands of the government cannot automatically invalidate the reseizure.

We think the present case is one where the prosecution has met the "difficult" task to establish an independent source for its knowledge of the location of the seized evidence. That is because we view the situation as if the illegal search had not occurred, thereby putting the prosecution in the same position, not a worse position. If the 1979 search and seizure had not occurred, the rifle would have remained at the Seager residence.[6] The State knew it was located there

6. We need not speculate on whether the rifle would have remained at the Seager residence so that it would have been found at that location at some later time because the United States Supreme Court has emphatically rejected the notion that absent an illegal seizure of evidence, the evidence probably would have been destroyed. In the *Segura* case, the Court refused "to further 'protect' criminal activity" by recognizing a defendant's right to destroy evidence, a proposition

that "defie[d] both logic and common sense." 468 U.S. at 816, 104 S.Ct. at 3391, 82 L.Ed.2d at 616. Consequently, we presume, as the Court did in *Segura,* that the illegally-seized evidence would not have been removed or destroyed before its reseizure. Although not required, this presumption is supported here by two facts: (1) Seager kept the rifle in his house for several months *after* he had refused the authorities' request to examine and test the gun; and (2) after

from sources independent of the illegal search. Absent the illegal search, the DCI investigation would have continued and an untainted search warrant would have been obtained to search the Seager residence and seize the rifle.

The United States Supreme Court has held that "when ... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, *there is no nexus sufficient to provide a taint and the evidence is admissible.*" *Williams,* 467 U.S. at 448, 104 S.Ct. at 2511, 81 L.Ed.2d at 390 (emphasis added). This rationale is even more compelling under the facts of this case because the location of the evidence had actually been discovered before the police misconduct. Under these unique circumstances, we think the nexus between the illegal search and the 1993 location of the weapon is not "sufficient to provide a taint." *Id.*

In summary, we find probable cause for the 1993 search warrant is not tainted by the illegal search of the Seager residence in 1979. Therefore, the exclusionary rule does not apply and the district court erred in sustaining the defendant's motion to suppress.

### VI. *Disposition.*

We have considered all arguments of the defendant in support of the district court's suppression ruling, even though not expressly discussed in our opinion, and reject them on their merits. Therefore, we reverse the district court's suppression of the challenged evidence and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

April 16, 1979, Seager remained imprisoned for the Wheelock murder.