# IN THE COURT OF APPEALS OF IOWA

No. 20-0738
Filed June 16, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ALPHONZE THEOPHILUS EMANUEL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, John J. Haney,

Judge.


        Alphonze Emanuel appeals a conviction and the sentences imposed on

three convictions.  **CONVICTION AFFIRMED; SENTENCE VACATED AND

REMANDED FOR NEW SENTENCING HEARING.**

        Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant

Attorney General, for appellee.

        Considered by Doyle, P.J. and Mullins and May, JJ.

**MULLINS, Judge.**

Alphonze Emanuel appeals his conviction of possession of methamphetamine with intent to deliver, challenging the sufficiency of the evidence supporting the charge. He also appeals the sentences imposed upon said conviction and two other convictions, arguing his waiver of in-person sentencing was not tendered knowingly and voluntarily.

I.     **Background Facts and Proceedings**

Upon the evidence presented at trial, a rational jury could make the following factual findings. In the spring of 2019, Marshalltown Police Department Detective Dane Bowermaster, serving as a member of the Mid-Iowa Drug Task Force, began a drug investigation relative to Emanuel. Bowermaster began surveilling a particular residence for indications of drug activity. Bowermaster testified the come-and-go nature of the traffic to the home over the next several days indicated the visitors were purchasing narcotics from the home.[1] Bowermaster sought and obtained a warrant to conduct a search of the home.

The search warrant was executed on May 3, 2019, shortly after 5:00 a.m. The special weapons and tactics (SWAT) team broke up into two units of four

---

[1] On April 23, Bowermaster observed a female report to the back door of the residence, upon which she was met at the door. On April 25, he observed a different female enter the rear door of the residence, stay for roughly three minutes, and then leave. In the neighborhood of two hours later, Bowermaster observed a male and female visit the residence, entering through the back door, and then leaving about two minutes later. About another two hours later, Bowermaster saw two other individuals leave the residence. Bowermaster again saw one of those individuals leaving the residence on April 29, when he was conducting mobile surveillance. About three hours later, a male visited the residence, staying for about two minutes. On April 30, one woman visited the residence for about five minutes, one of the prior visitors visited the home for seven minutes, and then a pair of other prior visitors visited the house for five minutes.

officers each, with one unit entering the front of the residence, and the other entering the rear. The SWAT team leader, Lieutenant Kiel Stevenson of the Marshalltown Police Department, conducted a knock and announce, which lasted roughly thirty seconds. While the knock and announce was being conducted, Deputy Rodney Drummer, an officer with the Tama County Sheriff's Department and investigator with the task force, was positioned on the southeast side of the home and he observed, through a curtain, a "silhouette or a figure" inside the home running to a room on the northwest side of the residence. Deputy Adam Winkowitsch of the Marshall County Sheriff's Department, also serving as an investigator for the task force, was positioned on the west side of the home. During the knock and announce, he observed "a shadow that had rushed past one of the windows on the west side of the house."

When there was no response to the knock and announce, the SWAT team breached the front and rear doors of the residence simultaneously. The front team cleared the living room and attached bedroom. In the bedroom, Bowermaster observed the covers on the bed "were thrown open like someone just got out of bed." The front team then joined the rear team in the kitchen. The rear team had already made contact with Emanuel and a female, Kelsey Tolbert, in the bathroom. Bowermaster viewed the bathroom and observed the toilet to be running, with "a crystalline substance both on the toilet seat and on the floor."[2] He testified, "At that time it was apparent to me that methamphetamine had been flushed down the

---

[2] The substance found in the bathroom tested positive for methamphetamine at the state crime lab.

toilet in the rush. Some spilled on the seat and spilled on the floor." A cell phone was also found in the bathroom.

Emanuel's son, Zach Dixon, was located standing at the bottom of the stairs to the basement, and Jose Cervantes Rodriguez was subsequently located in the basement. The subjects were detained and advised of their *Miranda* rights. Bowermaster questioned Emanuel about how much methamphetamine he flushed. Emanuel responded he flushed a teener, which consists of roughly 1.7 grams. Bowermaster responded he knew Emanuel flushed more because there was at least a teener on the bathroom floor. Emanuel responded he flushed a ball, meaning an "8-ball," which is one-eighth of an ounce or roughly 3.5 grams. Bowermaster re-pressed Emanuel, and Emanuel conceded he probably flushed around five grams of methamphetamine but it was cut. Bowermaster explained in his testimony cut product is essentially diluted, and a common user would not cut their methamphetamine because it reduces its quality. In contrast, dealers will cut the drug because it increases the amount and, by extension, profit from sales. In the living room, Bowermaster found three cell phones concealed in a heating and air conditioning register.[3] He also found a digital scale in the kitchen, which "was covered in a residue that appeared to be methamphetamine residue."[4]

After entering the residence, Deputy Drummer learned the room on the northwest side of the residence, to which he had observed the silhouette running, was the bathroom. Drummer found several pieces of evidence in the bedroom on the northeast side of the residence: (1) marijuana and marijuana roaches on a

---

[3] Only one was seized as evidence because the other two were not operating.
[4] The residue also tested positive for methamphetamine at the crime lab.

night stand; (2) a gray purse near the nightstand containing $50, a mailing addressed to Emanuel, and Emanuel's Illinois driver's license; (3) a black purse on the floor between the bed and nightstand containing $1418, Tolbert's driver's license and health and dental insurance cards, two EBT cards belonging to other individuals, Emanuel's Iowa identification card, and two EBT cards belonging to Emanuel and Tolbert.

Winkowitsch searched the basement, which included a bedroom belonging to Rodriguez, where he located a cell phone, a methamphetamine pipe, a baggie containing methamphetamine,[5] and "two empty baggies that looked like they may have contained methamphetamine at one time." In the kitchen of the residence, Winkowitsch also found a black bag containing baggies, which he testified, based on his training and experience, would be used for packaging in relation to drug distribution. Bowermaster also found marijuana and various cell phones in the basement bedroom belonging to Dixon.

The task force supervisor, Detective Sergeant James Gibson of the Marshall County Sheriff's Office, was positioned at the front of the house when the SWAT team conducted the knock and announce, during which he observed a shadow move quickly to the north end of the home. After the breach and securing of the residence, Gibson searched Emanuel and Tolbert and found $315 on Emanuel and a cell phone on Tolbert.

The cell phone found in the bathroom was subjected to a content-extraction device. Incoming and outgoing text messages to and from the phone disclose its

---

[5] This substance also tested positive for methamphetamine.

owner was in the business of selling both marijuana and methamphetamine.[6]  The evidence shows the phone belonged to Emanuel.[7]

Emanuel was charged by trial information with possession of methamphetamine with intent to deliver, prohibited acts, and second-offense possession of marijuana.  Following the presentation of the State's case-in-chief at trial, Emanuel moved for judgment of acquittal, arguing the State failed to prove he possessed the methamphetamine with an intent to deliver.  The court denied the motion.  No evidence was presented on behalf of the defense, and the jury found Emanuel guilty as charged.[8]  The matter proceeded to sentencing, which Emanuel participated in by video conference.  Emanuel appealed following the imposition of sentence.

## II.    Sufficiency of Evidence

Emanuel argues the district court erred in denying his motion for judgment of acquittal, claiming the evidence was insufficient to show he had an intent to

---

[6] Some text messages do not disclose which substance was being pursued by the buyer.  Some indicate "both" were.  Others specifically refer to marijuana, asking for "green" or "bud."  One incoming message sent to the phone a day before the search warrant was executed asked, "U got a ball?"  The outgoing message responded, "Yi."  The buyer later responded, "on my way to u."  One officer testified methamphetamine is commonly dealt in "8-balls," but that moniker is not used in referencing marijuana.  The officer testified some people call a "teener" a "tee."  One outgoing text message questioned, "Ok about how much u thinking," to which the recipient responded "t if you have it."  The following outgoing text stated, "Yea I got tht n more."
[7] The images extracted from the phone included several pictures of Emanuel that could be considered "selfies."  Also, the phone's contacts had listings for the other three occupants of the home, "Jose" (Cervantes Rodriguez), "Kels" (Tolbert), and "Zach" (Dixon), but not Emanuel.  Several of the incoming text messages also identified Emanuel by his nickname, "Mo."
[8] Emanuel previously stipulated to having a prior conviction of possession of marijuana in relation to count three.

deliver. Challenges to the sufficiency of the evidence are reviewed for corrections of errors at law. *State v. Mathias*, 936 N.W.2d 222, 226 (Iowa 2019). The court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010). In considering a sufficiency-of-the-evidence challenge, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)).

When viewed in the light most favorable to the State, the evidence discloses the following pertinent facts. Emanuel was in the possession of around five grams of methamphetamine at the time the warrant was executed at around 5:00 a.m. on May 3, 2019. Content on the phone found in the bathroom, which a rational jury

could have concluded belonged to Emanuel, shows he was in the business of trafficking methamphetamine leading up to the search. Specifically, at 9:22 p.m. on May 2 Emanuel responded in the affirmative when a customer asked if he had a ball, a slang for a specific weight of methamphetamine. The customer responded he or she was on his or her way thirty minutes later. Then, at roughly 1:45 a.m. on May 3, just hours before the search, another customer questioned, "You got anything"? About twenty minutes later, Emanuel responded, "Lil bit gotta get more." At around 3:45 a.m., Emanuel texted the customer, "how much u thinking"? The customer responded "50," to which Emanuel responded, "Ok." The customer replied, "Or t if you have it." Evidence was had that a "t," "tee," or "teener," is another slang term used for a denomination of methamphetamine. Emanuel responded, "Yea I got tht n more."

Viewing the evidence in the light most favorable to the State, as we must, we conclude a rational jury could have found Emanuel guilty beyond a reasonable doubt, and we affirm his conviction of possession of methamphetamine with intent to deliver.

## III. Sentencing

In response to the COVID-19 pandemic,[9] "our supreme court entered a number of supervisory orders concerning the pandemic's impact on court

---

[9] *See In re A.H.*, 950 N.W.2d 27, 34 n.6 (Iowa Ct. App. 2020) ("The novel coronavirus/COVID-19 is an ongoing international pandemic. To stem the spread, governments, including the state of Iowa, implemented emergency safeguards recommended by such agencies as the Center for Disease Control, which included social distancing and wearing of face masks. In Iowa, many businesses were ordered closed, people were encouraged to maintain six-foot distances between one another, and gatherings of ten or more people were discouraged.").

services." *State v. Emanuel*, No. 20-0737, 2021 WL 1906366, at *1 (Iowa Ct. App. May 12, 2021). "[O]n March 14, 2020, the court ordered that '[f]or sentencing hearings through April 20, district courts may allow any party (the prosecutor, defense counsel, defendant, victims and witnesses) to appear by videoconference with that party's consent. To appear by videoconference, the defendant shall execute a written waiver.'" *Id.* (second alteration in original) (citation omitted).

> The supreme court entered another order on April 2, in which it extended the sentencing procedure through August 3 but modified it to provide parties could appear by either videoconference or telephone and directing that, "To appear by videoconference or telephone, the defendant shall either (a) execute a written waiver or (b) make a waiver on the record. Other parties need not execute a waiver."

*Id.* (citation omitted).

At the commencement of Emanuel's sentencing hearing on April 13, the court explained Emanuel was participating by videoconference, while the attorneys were participating by "ICN teleconference."[10] The court explained the hearing was being conducted remotely as a result of the supervisory orders. The court separately asked Emanuel and all counsel if they were agreeable to participating remotely, and each answered in the affirmative.

On appeal, Emanuel argues "waiver of his right to be personally present at his sentencing was not intelligent, voluntary, or knowing." He complains the court did not explain he could have in-person sentencing or it could continue the hearing for said purpose.

---

[10] "ICN (Iowa Communications Network) 'is a statewide, governmental network that includes a two-way videoconferencing system.'" *Emanuel*, 2021 WL 1906366, at *1 n.6 (citation omitted). Apparently it has a teleconference feature, as the court noted the attorneys were participating that way.

As we recently stated,

> A defendant does have a right to personal presence at sentencing, but the right may be waived.  *See State v. Webb*, 516 N.W.2d 824, 830 (Iowa 1994); *State v. Daniels*, No. 15-1601, 2016 WL 4803782, at *1 (Iowa Ct. App. Sept. 14, 2016).  "To be valid, a defendant's waiver of the right to be present must be knowing, intentional, and unambiguous."  *Daniels*, 2016 WL 4803782, at *2.

*Id.* at *2.

The standard definition of "waiver" is "the intentional relinquishment of a known right."  *State v. Seager*, 571 N.W.2d 204, 209 (Iowa 1997).  Here, the court advised it was conducting the hearing remotely by order of the supreme court.  And the court only asked if Emanuel was agreeable to proceeding with sentencing by video conference.  Different from a recent case, the court did not advise Emanuel of his "right to make a personal appearance in court" or that "the hearing did not have to proceed unless Emanuel was in agreement with that procedure."  *Cf. Emanuel*, 2021 WL 1906366, at *2.  So the record before us offers no indication that Emanuel knew of his continuing right to in-person sentencing, and his waiver of the same was therefore invalid.  *See Daniels*, 2016 WL 4803782, at *2.  We reject the State's harmless-error argument, as there is no way to tell what the outcome would have been had the sentencing judge and Emanuel been face to face.

We vacate the sentences imposed on Emanuel's convictions and remand the matter for a new sentencing hearing.

## IV.    Conclusion

We find the evidence sufficient to support Emanuel's conviction of possession of methamphetamine with intent to deliver.  We vacate the sentences

imposed on Emanuel's convictions and remand the matter for a new sentencing hearing.

**CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED FOR NEW SENTENCING HEARING.**