In re the MARRIAGE OF David Allen KLEIST and Adriana Hilda Mendez.

Upon the Petition of David Allen Kleist, Appellant,

And Concerning

Adriana Hilda Mendez, Appellee.

No. 94–25.

Supreme Court of Iowa.

Sept. 20, 1995.

Rehearing Denied Oct. 25, 1995.

---

John W. Hayek of Hayek, Hayek & Brown, Iowa City, and Timothy G. Pearson of Hyland, Laden & Pearson, P.C., Des Moines, for appellant.

Lori L. Klockau and Daniel L. Bray, Iowa City, for appellee.

NEUMAN, Justice.

This dissolution of marriage action is before us on further review from a split decision in the court of appeals. That court reversed a custody ruling that would have given the mother primary care of the parties' daughter. The reversal stemmed from the court of appeals' view that the district court gave undue weight to the mother's strongly

held cultural beliefs, leading it to effectively reinstate the "tender years" doctrine long ago abandoned by this court.

Our de novo review leads us to conclude that the best interest of the child—not gender or cultural stereotyping—motivated the district court's decree. We, therefore, vacate the court of appeals decision and affirm the judgment of the district court.

## I. *Background.*

Petitioner David Kleist and respondent Adriana Mendez were married in Iowa City in June 1988. David was then pursuing a graduate degree in counseling while working part-time at the university psychiatric hospital. Adriana was a tenured associate professor with dual appointments in the university's comparative literature and Spanish and Portuguese departments. Soon after their marriage, David earned his masters degree and secured a full-time position as a family therapist. Their only child, Juliana Kleist-Mendez, was born November 1, 1989.

Juliana is, by all accounts, an exceptional child. She is described as healthy, bright and energetic, intellectually advanced for her age (three at the time of trial) and well adjusted in every way. She is bilingual, a skill learned from Adriana with David's strong support. She is clearly adored by her parents and demonstrates no closer emotional attachment to either one.

David and Adriana, who were both aged forty-two at the time of trial, have adjusted their professional schedules whenever possible to maximize the time available for parenting. Adriana arranged for a sabbatical around the time of Juliana's birth and nursed her for nearly a year. David, meanwhile, contributed equally to child rearing and housekeeping duties. Adriana has occasionally arranged for Juliana to accompany her on out-of-town trips when she is lecturing or doing research.

The deterioration of the parties' marriage necessarily altered this equal and somewhat unique sharing of Juliana's care. A contest over her custody ensued. In December 1992, the court entered a temporary order for joint custody that placed Juliana in Adriana's primary care. David was granted liberal visitation which he has regularly exercised.

Both before the trial court, and now on appeal, the parties have framed much of their debate around the cultural differences that have simultaneously animated and stressed this family unit. David, who is Minnesota born and bred, prides himself on his even-tempered nature and consistency in relationships with others. Adriana, who was born in Havana, Cuba, and lived there until immigrating to the United States with her family at age ten, admits that she is more "easily aroused to emotion." Evidently their marriage has amplified the worst, rather than the best, of these personality features. Thus David and his witnesses tend to describe Adriana as volatile and erratic. Adriana views David as emotionally cold and unsupportive. Neither believes the other would provide the kind of day-to-day nurturing Juliana needs.

Adriana's strong link to her Hispanic heritage also carries with it a belief that young children, especially girls, should be the primary responsibility of their mother. She describes motherhood as "sacred." Her opinion in this regard is so fixed that the prospect of losing primary care of Juliana made her more openly anxious than David about the custody-evaluation process. In the words of Dr. Marilee Fredericks, an experienced psychologist (selected by David) who performed the evaluation for the court, the idea of being just a "visited" parent is "so far outside [Adriana's] lexicon" that it would seriously disrupt her relationship with Juliana. David, on the other hand, while desiring to be Juliana's primary caretaker, appears capable of fulfilling either role. Dr. Fredericks credited this flexibility to David's training as a family therapist, a job that requires him to pick up and maintain continuity in a relationship.

Having heard the testimony of the parties and their witnesses, and having personally observed them in four days of trial, the district court decided that joint custody with Adriana as primary caretaker would serve Juliana's best interest and "enhance the overall access and contribution of both parents to this child and the child to her par-

ents." The court gave three reasons for its conclusion: (1) that Adriana would be much less effective in the role of visited parent than in the role of primary caretaker because of her parenting style and "to some extent" her deepseated beliefs about the role of a mother; (2) Adriana's work schedule is significantly more flexible than David's and would allow her to provide significant periods of time for Juliana; and (3) Juliana was very comfortable with the temporary care arrangement then in effect. The court also divided the marital assets and denied Adriana's request for permission to take Juliana with her outside the country for extended periods while on sabbatical or other academic pursuits. This appeal by David and cross-appeal by Adriana followed.

## II. *Issues on Appeal.*

■ David challenges the custodial and economic provisions of the decree, while Adriana contests the court's restriction on her ability to have Juliana accompany her on extended academic travel. As in all cases involving such issues, our review is de novo and our primary consideration is the best interest of the child. *In re Guardianship of Knell,* 537 N.W.2d 778, 780 (Iowa 1995). Prior cases are of little precedential value, except to provide framework for analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us. *In re Marriage of Will,* 489 N.W.2d 394, 397 (Iowa 1992). With these principles in mind, we turn to the parties' contentions.

■ A. *Custody.* David believes that the record plainly establishes him as the parent best able to minister to Juliana's long-term best interests as well as the one most likely to promote meaningful contact with the other parent. *See* Iowa Code § 598.41 (1995); *In re Marriage of Winter,* 223 N.W.2d 165, 166 (Iowa 1974) (factors bearing on custody decision). He also contends that by considering Adriana's professed aversion to the role of "visited" parent, the trial court "improperly reintroduce[d] the 'tender years' presumption' through psychological and cultural rationalizations." It is this latter argument that convinced a divided court of appeals to reverse the trial court's custody award.

We first address the "overall fitness" argument. Perhaps the most remarkable feature of this record is the unanimous opinion of every objective observer—including the trial court and the court of appeals—that both of the parties are exceedingly capable and loving parents. No meaningful differences exist to distinguish them in terms of their relative abilities to serve as Juliana's primary caretaker. The stress of this marital breakdown has inevitably taken its toll on each party's opinion of and relationship with the other. But there is no evidence to suggest that Juliana's long-term well being has been, or will be, adversely affected by Adriana's occasional volatility or David's tendency to be overcontrolling or distant.

Nor does the record suggest that either party would fail to foster Juliana's ongoing relationship with the noncustodial parent. We reject outright David's suggestion that Adriana's early request for "sole" custody should automatically disqualify her. The record makes plain that she favors joint custody in principle and harbors doubts about its suitability here only because of the parties' breakdown in communication. Her fears are not groundless. And in no event should she be penalized merely for expressing them.

Indeed we are troubled by the lack of cooperative spirit demonstrated by David during the course of these proceedings. Following the court's temporary custody order, for example, David refused to vacate the marital residence. After three weeks of escalating tension, Adriana felt compelled to uproot Juliana from the only home she had ever known in order to preserve the peace. Soon after, and without Adriana's knowledge, David began lengthy visits with Juliana at preschool on his nonvisitation days, a situation ultimately deemed disruptive by preschool personnel and discontinued at Adriana's request. Next, Adriana had to secure an injunction to prevent David from taking Juliana, then three years old, to meet his lawyer at her office. Finally, a dispute arose over Juliana's medical treatment. The upshot of it was that Adriana directed medical personnel to consult her for all treatment authority (except in an emergency)—a resolution applauded by Juliana's pediatrician

who testified that not only was Juliana basically healthy and appropriately treated in Adriana's care, but that it was preferable, in case of disagreeing parents, for one to have the final say.

This conduct by David could be interpreted as an attempt to undermine Adriana's court-ordered caretaking authority. Viewing the record as a whole, however, we believe that David—as well as Adriana—is quite capable of fostering ongoing communication about the parties' mutual responsibility towards Juliana.

Given each party's undifferentiated ability to care for Juliana and, with some work, to foster her long-term relationship with the other, the district court's decision to focus on who would best fill the role of noncustodial or "visited" parent becomes important. It was drawn into this analysis by Dr. Fredericks, who sought to make a recommendation that, in her words, "represents the best combination of parental strengths." Placing Juliana in Adriana's primary care, with liberal visitation by David as joint custodian, Dr. Fredericks testified, would be the least disruptive arrangement and the one most likely to insure Juliana's ongoing contact with both her parents. The same opinion was voiced by the only other two objective witnesses, Juliana's preschool teacher and the preschool administrator. Both these persons had observed the family's interaction almost daily over a two-year period.

■ David complained in the trial court, and argues on appeal, that such an approach unfairly penalizes him for his flexibility and rewards Adriana for her culturally-based intransigence. Child custody decisions, however, are not matters of reward or punishment. *In re Marriage of Bowen*, 219 N.W.2d 683, 687 (Iowa 1974). Responding to the question of "fairness," Dr. Fredericks stated that her approach is "to come up with something that is fairer for the child than it is for either of the parents." There is no evidence before us to counter Dr. Frederick's approach, nor do we find its application inconsistent with Juliana's best interest as revealed by this record.

■ The fighting issue is the extent to which Adriana's Hispanic heritage should be permitted, if at all, to impact the custody decision. On the one hand, we agree entirely with the court of appeals' expressed view that "we cannot let a person's cultural beliefs put him or her in a *superior position* when we assess the custody issue." (Emphasis added.) At the same time, we do not believe a court should ignore the way in which a person's background shapes their attitude toward parenting. If a litigant held a fixed cultural belief that the genetic superiority of boys entitled them to greater opportunity than girls, for example, we would surely consider such a factor in the placement of a child. Likewise here, Adriana's beliefs translate into a distinctive parenting style. Neither the ethnic origin of such a belief, nor the fact that she holds it, is controlling. What is important is the *impact* of that belief on her role as a parent.

The record reveals that Adriana harbors genuine doubt that a woman can fulfill the mothering role outside the caretaking context. Her parenting style relies heavily on close verbal interaction—alternating between English and Spanish—and small continuous nurturing and guidance activities. Although she could learn to adjust her style to accommodate a noncustodial role, the adjustment for her would be particularly difficult. It would, in Dr. Fredericks' opinion, take longer than for most parents. Her unhappiness in the meantime, Dr. Fredericks opined, would likely manifest itself in an unrelenting solicitation of expressions of love and loyalty from Juliana, ultimately leading to an intense and conflictual relationship that would have difficulty surviving. Such an outcome would clearly not be in Juliana's best interest.

■ We do not believe that accepting Dr. Fredericks' candid assessment of the situation either exalts one culture over another or reinstates the "tender years" doctrine. *Cf. Bowen*, 219 N.W.2d at 688 (abandoning preference for mothers in custody determinations). The district court carefully weighed all the factors before it and came up with a custodial arrangement that draws on each parent's strengths and minimizes their weaknesses. *See In re Marriage of Weidner*, 338 N.W.2d 351, 358 (Iowa 1983) ("In the last analysis, the custodial determination must

reflect and accomplish whatever is in the best interest of the affected children."). In that assessment we give considerable weight to the sound judgment of the trial court who has had the benefit of hearing and observing the parties firsthand. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

We also cannot ignore the other two reasons given by the trial court for favoring Adriana as the primary caretaker. As a teacher, Adriana's schedule is much more flexible than David's, giving her more time to spend with Juliana. Perhaps most important, Juliana is comfortable and settled in her present surroundings. No compelling reason appears to disrupt that placement which has now extended nearly three years. We therefore affirm the district court's grant of joint custody with primary care vested in Adriana and liberal visitation as outlined in the court's decree.

■ B. *Property settlement.* The parties' marital assets consisted primarily of home equity and individual pension plans. Adriana's financial contributions to the family unit far outweighed David's. The district court fashioned a division that took account of this disparity while recognizing the equal contribution made by the parties toward child rearing and housekeeping. The division, challenged as inequitable by David on appeal, was affirmed in its entirety by the court of appeals. The matter was not raised by either party on further review. Like the court of appeals, we find the division of marital property equitable and affirm the judgment of the district court.

■ C. *Extended visitation.* The record reveals that Adriana, as a scholar in Latin American studies, is often invited to lecture outside the United States. She also anticipates sabbaticals devoted to research in Spain and Latin America. Juliana has accompanied her in the past on such trips. Both Adriana and David seem to agree that this traveling could be intellectually beneficial to her.

Pursuant to a posttrial motion under Iowa Rule of Civil Procedure 179(b), Adriana asked the trial court to grant her request that she be allowed to take Juliana with her on such trips in the future. The district court denied her request without comment. Adriana has cross-appealed the court's ruling.

Adriana asks, in effect, that David's rights to visitation should on occasion be subordinated to her desire to have Juliana accompany her on extended trips outside the country. Like the district court, we do not believe it is necessarily in Juliana's best interest to do so. We interpret from the court's decision its tacit belief that such extended travel would unduly interfere with David's right to regular and frequent contact with his daughter. If, as in the past, the parties can agree that such travel would benefit Juliana, then they may make such arrangements as they choose. They are encouraged to thoughtfully weigh the merits of such experiences for Juliana on a case-by-case basis.

In this and all other respects, the judgment of the district court is affirmed.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED ON APPEAL AND CROSS–APPEAL.**

All justices concur except McGIVERIN, C.J., and LARSON, LAVORATO, and SNELL, JJ., who dissent.

McGIVERIN, Chief Justice (dissenting).

I respectfully dissent.

The fighting issue here is which parent, David Kleist or Adriana Mendez, should be awarded the physical care of their five year old daughter, Juliana.

I would award the physical care of Juliana to her father, David, for several reasons, which follow. Accordingly, I would affirm the court of appeals decision, which gave David physical care, and reverse the district court judgment as to that issue and related visitation and child support.

I. *Custody considerations.* In child custody cases, the first and governing consideration is the best interest of the child. Iowa R.App.P. 14(f)(15). Iowa Code section 598.41 lists nine factors for courts to weigh in deciding what is in the best interest of the child. Furthermore, courts consider factors we out-

lined in *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974), before making difficult primary care decisions.

I agree with the trial court's award of joint custody of the child to both parents. *See* Iowa Code § 598.41(2). However, it is significant to note that at the trial level, Adriana opposed joint custody and wanted sole custody of Juliana for herself. *See id.* § 598.41(3)(g).

II. *Trial court's award of physical care.* The next question we must ask is who shall be the primary physical caretaker of Juliana?

On this difficult issue, the trial court stated:

> The Court ... finds that [Adriana] should be awarded the primary physical care of Juliana.... This Court's decision to award primary physical care to Adriana is not the result of any perceived deficiencies in David's ability to parent. It is obvious from the evidence that *David is an excellent parent with much to offer Juliana.* However, I share Dr. Fredericks' [an investigator's] view that Juliana's best interests will be served if she is placed in the primary physical care of her mother. I share Dr. Fredericks' view that the placement of primary care with Adriana will enhance the overall access and contribution of both parents to this child and the child to her parents. It appears to this Court, as it did to Dr. Fredericks, that *Adriana* Mendez *would be much less effective in the [non-custodial] role of visited parent than in the role of primary caretaker. This is because of her parenting style and to some extent her deep-seated beliefs about the role of a mother.*

(Emphasis added.)

The trial court relied on a report of the investigator, Dr. Marilee Fredericks, that stated:

> [T]he physical care arrangement that would be *most* disruptive of Juliana's parent/child relationship would be placement of that care with Mr. Kleist. This is because, despite my opinion that Ms. Mendez can fulfill the role of primary caretaking parent, *I doubt her ability to serve as an effective parent in the visited parent con-*

*text. This is partly due to her in-grained/deep-seated doubts that a mother can fulfill the mothering role outside of the caretaking context* and partly due to her parenting style which relies heavily on on-going interactions and small continuous nurturing and guidance activities which are integrated with those interactions.

(Emphasis added.)

Adriana, the mother, is of Cuban heritage, is a United States citizen and has been in this country for 34 years. She claims an ethnic view that she cannot properly function as a mother to Juliana unless she has the physical care of Juliana.

In substance, the investigator, Dr. Fredericks, and the trial court honored that ethnic belief and thus awarded the physical care of Juliana to the mother, Adriana. The award was made supposedly in the best interest of the child, Juliana, because otherwise Adriana might not be able to effectively contribute emotional support to the child as a "visited parent," *i.e.,* a parent that the child would visit.

I believe that was an impermissible consideration. I agree with the court of appeals decision on this issue: "We respect the cultural differences of the litigants before us, but we cannot let a parent's cultural beliefs put him or her in a superior position when we assess the custody issue."

Also, a parent's "cultural disposition" is not one of the factors listed in Iowa Code section 598.41 to be considered when deciding what is in the best interest of the child.

III. *Adriana's unwillingness to be an emotionally-supportive, noncustodial parent.* In essence, Adriana asserts that she will not play an emotionally-supportive role in Juliana's life if she does not get her way by being awarded physical care of Juliana. An analogy to Adriana's assertion can be drawn to the parent who refuses to pay monetary support for the child unless the parent is awarded physical care or desired visitation with the child. We have said the noncustodial parent nevertheless owes monetary support to the child despite the personal disappointment of not being the primary caretaker. The same principle should apply to Adriana here who

indicates she will withdraw emotional support for the child unless she is awarded physical care. In sum, it is no more valid to allow the cultural background and conditional emotional support of Adriana to be considered regarding an award of physical care than to excuse a noncustodial parent from paying court-ordered monetary support.

Here, both the trial court and Dr. Fredericks penalized and precluded David from being the physical caretaker because they believed he was mature enough to be able to function as a noncustodial parent, whereas Adriana was not so capable and mature.

IV. *Reintroduction of the "tender years" presumption.* We have abandoned any presumption in favor of the mother having physical care of a small child. *In re Marriage of Bowen,* 219 N.W.2d 683, 688 (Iowa 1974). I believe the trial court's award of physical care to Adriana, based on her purported inability to be a "visited parent," improperly reintroduces the "tender years" presumption through cultural rationalizations. In addition, David's testimony and the other record supports the court of appeals finding that if physical care is granted in favor of David, Juliana will be assured exposure to the cultural values of both her father and mother. *Cf. Lambert v. Everist,* 418 N.W.2d 40, 42 (Iowa 1988) (father awarded primary physical care of daughter in part because the father viewed his daughter's exposure to other cultures and lifestyles as positive, whereas mother wished to limit daughter's exposure to only mother's lifestyle).

We should not adopt, in substance, a rule that the more pliable parent should have that trait held against him or her on custody and physical care matters.

V. *Other cases involving personal beliefs.* In at least two cases, we decided not to reward a parent who obstinately refused to allow visitation or custody to the parent who did not physically possess the child. *Cf. In re Marriage of Quirk–Edwards,* 509 N.W.2d 476, 480 (Iowa 1993) (holding wife, who wilfully sought to deprive noncustodial father from decreed visitation rights, was no longer deserving of physical care of the child). Just as we did not reward the mother who sought to cut off all ties of the father from his child in *Quirk–Edwards,* Adriana should not be rewarded with physical care solely on one of her purported cultural dispositions.

Also, in *Amro v. Iowa District Court,* 429 N.W.2d 135 (Iowa 1988), we did not reward a father who had strong cultural beliefs and wanted a panel of Islamic scholars rather than a court to decide a custody dispute over his son. *Id.* at 137–38.

The trial court's award of physical care based in part on Adriana's cultural disposition sets bad precedent with untold, unfortunate ramifications. Every parent desiring physical care could assert a like-claim.

VI. *Relevant evidence concerning the physical care award.* After putting aside the mentioned impermissible consideration concerning Adriana's ethnic beliefs, other relevant factors bearing on the award of physical care must be considered.

The record shows, and the trial court stated, that David is an excellent father and has much to offer Juliana. He consistently cared for Juliana while the parties lived together and has apparently never acted aggressively in front of her.

In contrast, the record reflects Adriana has exhibited violent tendencies in the past. Dr. Fredericks testified at trial:

> One of the concerns that Mr. Kleist has had is about her volatility—[Adriana]'s volatility, the potential for perhaps angry outbursts, the potential for perhaps intimidating or hurting Juliana in some way. When you apply the norms, that is a *cultural* feature.... [P]erhaps Hispanic women are normally volatile....

Dr. Fredericks then testified: "I'm no expert on [Adriana's] culture." This testimony is consistent with well-documented instances of angry, violent outbursts by Adriana in front of Juliana within the home.

Adriana's actions have allegedly been so extreme at times that David filed domestic abuse charges against her in November 1992. In his petition, filed under Iowa Code chapter 236, David alleged he was in "imminent danger of physical harm if a protective order to vacate homestead is not issued in this case." The record does not show this charge

was tried. Although Adriana vigorously denied allegations of domestic abuse, she admits she has a tendency to over-react and claims this is due to cultural differences and divergent family values.

According to Adriana, "[b]ehavior considered abusive in this country ... is socially acceptable in Hispanic culture as a means to air grievances and channel pent-up anger." In addition, Adriana admits she must engage in "various meditation techniques to curb [her] in-born propensity to be carried away with her emotions." Dr. Fredericks also concluded Adriana had tendencies toward suspiciousness, hostility, irritability, feeling mistreated and angry and resentful.

Adriana's volatility should not be rewarded.

As before stated, there is no evidence in the record to suggest David exhibits any of the negative character traits exhibited by Adriana.

The personality profile tests administered by Dr. Fredericks to Adriana revealed: "Her responses are consistent with a tendency toward suspiciousness, toward feeling mistreated and angry and resentful, and a tendency to be hostile, irritable, and easily hurt."

I do not feel it would be in Juliana's best interest for Adriana's characteristics to be perpetuated in Juliana by making Adriana the primary caretaker.

VII. *Juliana's characteristics.* At the time of trial, testimony revealed Juliana's social and emotional development was above age expectancy. She was also characterized by the trial court, however, as being a "demanding and controlling little girl." These latter character traits are generally more consistent with Adriana's disposition than David's. I feel primary physical custody with Adriana would only exacerbate Juliana's demanding and controlling character traits and would not be in Juliana's best interest.

VIII. *Conclusion.* In summary, I agree with the court of appeals that stated:

Juliana's interest will be better served in David's primary care. David has the maturity and understanding to foster her relationship with Adriana despite Adriana's professed resistance to being a noncustodial parent. In David's custody, Juliana will be assured exposure to the cultural values of both her father and mother.

I would affirm the court of appeals decision as to the physical care, property division, and all other issues. The district court's judgment would be reversed accordingly.

All justices concur except McGIVERIN, C.J., joined by LARSON, LAVORATO, and SNELL, JJ.