**IN THE COURT OF APPEALS OF IOWA**

No. 14-1919
Filed September 10, 2015

**IN RE THE MARRIAGE OF MARTIN G. COON
AND REBEKAH A. COON**

**Upon the Petition of
MARTIN G. COON,**
        Petitioner-Appellant,

**And Concerning
REBEKAH A. COON,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Buena Vista County, Don E.

Courtney, Judge.


        The father appeals the modification decree awarding legal custody of the

parties' children to the mother.  **AFFIRMED.**


        R. Scott Rhinehart of Rhinehart Law, P.C., Sioux City, for appellant.

        Nicholas J. Brown of Nick Brown, P.C., Storm Lake, for appellee.


        Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**MCDONALD, J.**

Martin and Rebekah Coon married in 2006 and divorced in 2011. Two children were born to the marriage: K.C., a daughter, born in 2007; and J.C., a son, born in 2008. The dissolution action was bifurcated. A decree dissolving the marriage and dividing the property was entered on April 15, 2011. A second decree regarding custody and placement of the children was entered on April 10, 2012. The decree awarded the parties joint legal custody of the children, awarded Rebekah physical care of the children, and awarded Martin liberal visitation, including the right to have a daily telephone call with the children at 8:00 p.m. On April 5, 2013, Martin and Rebekah each filed an application to modify the decree. The district court granted Rebekah's petition, awarding her sole legal custody of the parties' two children and reducing the number of telephone calls Martin was entitled to have with the children. At the time of trial, the parties lived a great distance from each other; Martin residing in Cedar Falls and Rebekah residing in Storm Lake. The district court denied Martin's application seeking physical care of the children. Martin timely filed this appeal.

Our review in the equity proceeding is de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We review the entire record and decide anew the factual and legal issues properly preserved and presented for appellate review. *See Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). While our review is de novo, we give weight to the credibility determinations of the district court. *See Hoffman*, 867 N.W.2d at 32. "[O]ur primary consideration is the best interest of the child[ren]." *In re*

*Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995). In determining what is in the best interests of the children, our prior cases have little precedential value; we must consider the unique facts and circumstances of each case. *See, e.g.*, *In re Marriage of Snowden*, No. 14-1920, 2015 WL 4233449, at *1 (Iowa Ct. App. Jul. 9, 2015) ("All happy families are alike; each unhappy family is unhappy in its own way." (quoting Leo Tolstoy, *Anna Karenina* 1 (1873))).

Modification of the custody provisions of a dissolution decree is only permissible "when there has been a substantial change in circumstances since the time of the decree" that was not contemplated when the decree was entered. *See In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App. 1998). When there has been a failure of communication and cooperation between parents under a joint legal custody arrangement, a modification of custody status is appropriate. *See In re Marriage of Rolek*, 555 N.W.2d 675, 677 (Iowa 1996).

Legal custody is "an award of the rights of legal custody of a minor child to a parent under which a parent has legal custodial rights and responsibilities toward the child." Iowa Code § 598.1(5) (2013). These rights and responsibilities "include but are not limited to decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." *Id.* Legal custody allows parents to participate in fundamental decisions affecting their child. *In re Marriage of Hansen,* 733 N.W.2d 683, 690 (Iowa 2007). Joint custody provides "both parents [with] legal custodial rights and responsibilities" with neither parent's rights or responsibilities being superior to the other. *See* Iowa Code § 598.1(3). Joint legal custody is the preferred

legal arrangement. *See* Iowa Code § 598.41(3); *In re Marriage of Weidner*, 338 N.W.2d 351, 359 (Iowa 1983); *Rees v. Calef*, No. 14-1231, 2015 WL 3624385, at *3 (Iowa Ct. App. Jun. 10, 2015). To award sole legal custody there must be clear and convincing evidence that joint legal custody "is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed." Iowa Code § 598.41(2)(b). In considering what custodial arrangement is in the children's best interest, this court considers the various factors set forth in Iowa Code section 598.41(3).

On de novo review, we conclude Rebekah established a substantial and material change in circumstances since the time of the original decree and it is in the best interests of the children to change the parents' custodial arrangement viz-a-viz the children. We further conclude there is clear and convincing evidence supporting the award of sole custody. The record reflects the parents have become increasingly hostile to one another and cannot effectively communicate regarding the children and cannot jointly make good decisions for and in the best interests of the children. The record further reflects the hostility between the parties is actively interfering with therapy for their child K.C. Because the record fairly reflects Martin is the cause of much of the conflict and interference with K.C.'s treatment and because Rebekah already had physical care of the children, we also conclude awarding Rebekah sole legal custody of the children and physical care of the children was appropriate under the circumstances.

We need not reiterate all of the disputes between the parents and Martin's conduct—much of that was set forth in the district court's lengthy and thoughtful modification order. We discuss several as exemplars. One of the primary sources of friction between the parties related to a criminal complaint filed by Rebekah against Martin. On October 15, 2012, Martin wrote "#breakingpoint a vendeictive [sic] woman files for more money and and a restraining order against a man that wanted to be with his kids more lost." The same day, Martin also wrote on his twitter feed, "Next day #breakingpoint he walks in to her work feeling he has lost everything and shoots the woman then himself. #vendetta". These tweets were posted shortly after Martin received notice of income withholding. As a result of these tweets, Rebekah felt threatened, filed a criminal complaint against Martin, sought an order of protection, and installed a security system in her home. Ultimately, the criminal case was dismissed because the tweets did not contain a direct threat of violence against Rebekah. Martin contends the fact he was not convicted demonstrates Rebekah pursued the matter in bad faith. We disagree. From the surrounding context, including a history of emotional, psychological, and physical abuse inflicted by Martin on Rebekah, Rebekah had reason for concern and did not unnecessarily escalate the situation.

Another source of great friction between the parties arises out of allegations of sexual abuse the children made against Martin's stepson. The children claimed the stepson had exposed himself to them. Rebekah brought K.C. and J.C. to the doctor's office where she worked as a medical assistant. The doctor spoke to J.C., who "kind of" made reference to someone touching him

inappropriately at Martin's house. A nurse spoke with K.C., who disclosed Martin's stepson touched her inappropriately. As mandatory reporters, the doctor and nurse reported the allegations to the department of human services. During the investigation, Rebekah filed an emergency application to cease visitation. The allegations were unfounded. Martin filed professional complaints against both the reporting doctor and nurse. Each complaint was investigated and closed with a finding no wrongdoing. Martin is convinced Rebekah put the children up to this, and he has become obsessed with catching the children in lies, including taking action contrary to the therapeutic needs of K.C. and audiotaping the children for potential litigation purposes.

Another serious source of friction between the parties relates to the mental health care provided to K.C. K.C. was in therapy before the initial decree was filed and continued in therapy afterward. Part of the ongoing therapy related to "anxiety that she was feeling when she would transfer from mom's care to dad's care for visitation." One of K.C.'s therapists was Ms. Gotto, who specializes in child therapy. On September 20, 2012, K.C. told Gotto that Martin took all of her toys, because she "lied." When Gotto asked K.C. what she lied about, she said she did not know and if she did lie she would not get her toys back. K.C. also told Gotto that she was mad Gotto was telling Martin their conversations. Gotto never told Martin their conversations. Instead, Martin had copies of the notes from the therapy sessions and was questioning K.C. Part of Gotto's therapy plan was to include Martin in K.C.'s therapy. Gotto tried to arrange joint therapy sessions with Martin, but K.C. told Gotto she did not want him to attend. Gotto

testified Rebekah never requested her to keep Martin from attending the therapy sessions. On the last occasion Gotto cancelled a therapy session with Martin, he became angry. He told Gotto he was required by court order to attend the therapy sessions, and he threatened to file contempt charges against Gotto if she did not allow him to do so. When Gotto could not calm Martin down, she decided it was in the best interests of K.C. to not be exposed to Martin's anger. On April 21, 2012, Gotto wrote a letter to Rebekah and her attorney recommending they cease the children's visitation with Martin because of the rise in K.C.'s stress level. Gotto reported K.C. had continuous statements of being worried about being stolen and fear of her dad being mean. K.C. was also experiencing an increased inability to sleep. Rebekah denied access to the children based on Gotto's recommendation.

K.C.'s mental health condition transitioned from an adjustment disorder into general anxiety disorder and post-traumatic stress disorder. Sandy Pelzer started treating with K.C. in July 2013. K.C. often expressed concerns Martin had a ghost in the office that was recording her therapy sessions. K.C. also believed Pelzer tells her father everything they talk about in therapy. Pelzer testified the children are led to believe that their father knows information they have shared in therapy sessions and the children "don't entirely feel safe in therapy, which is a real problem." Pelzer said she told Martin that he should stop recording the children because it destroys trust in his relationships. The relationship between Martin and Pelzer became hostile. Rather than focusing on K.C. and her treatment, Martin simply demands to know every detail of K.C. and

Pelzer's therapy sessions and raised complaints with Pelzer's supervisors. Ultimately, Pelzer was unable to continue to treat with K.C. because of Martin's interference. K.C. was without treatment at the time of trial.

Martin argues Rebekah should not have sole custody because she "has done everything humanly possible to interfere with Martin's rights as a parent" and "has treated the children as pawns." Martin claims Rebekah: (1) terminated phone calls between Martin and the children, (2) denied Martin visitation without a court order, (3) filed frivolous criminal charges which were dismissed prior to trial, (4) told the children to lie about being physically and sexually abused, (5) took the children to a neighboring town near Martin for a weekend and did not tell him they would be nearby, (6) spoke in negative terms about Martin to the children, (7) took the children to a multitude of therapists seeking one willing to ignore Martin's rights as a father, (8) set into motion false abuse allegations, and (9) made every effort to drive a wedge between Martin and his children so that they learn to hate him as much as their mother does. We need not discuss each of the claims in detail. On de novo review, we find and conclude the contentions are without merit.

The various conflicts between the parents about these issues and others have made the prospect of a cooperative joint custodial arrangement largely untenable. The parents do not speak to each other except by email. Martin frequently refuses to meet Rebekah at the exchange point with the children. Instead, he sends his parents to pick up his children while he waits somewhere close by to complete the exchange. The parties cannot agree on a therapy plan

for K.C. because of Martin's belief Rebekah is using therapy to manipulate the children to hate him. We affirm the award of sole legal custody to Rebekah. *See In re Marriage of Gensley*, 777 N.W.2d 705, 715-17 (Iowa Ct. App. 2009) (awarding sole legal custody to the mother because of parents' "utter inability" to communicate with each other and the father's failure to support the mother's relationship with the children); *In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996) (affirming sole legal custody for the father, because of the parents' inability to communicate and the mother did not support the father's relationship with the child); *Rees*, 2015 WL 3624385, at *4; *In re Marriage of Bloss*, No. 1999-156, 2000 WL 63192, at *4 (Iowa Ct. App. Jan. 26, 2000) (affirming award of sole legal custody where there was a "total absence of cooperation and communication" between the parents).

Martin also argues the court should have granted his application and awarded physical care of the children to him rather than Rebekah. Physical care provides a parent with "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." *See* Iowa Code § 598.1(7). The changing of physical care of a child is one of the most significant modifications that can occur in family matters. *See In re Marriage of Thielges*, 623 N.W.2d 232, 236 (Iowa Ct. App. 2000); *see also Hoffman*, 867 N.W.2d at 32. The parent requesting the modification "must establish by a preponderance of the evidence" there has been a substantial and material change in circumstances and it is in the children's best interest to make a change in physical care. *Hoffman*, 867 N.W.2d at 32 (citing *In re Marriage of Frederici*, 338 N.W.2d 156,

158 (Iowa 1983)). These "changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary." *Id.* (quoting *Frederici*, 338 N.W.2d at 158). The substantial change in circumstances must affect the welfare of the children. *See id.* (quoting *Frederici*, 338 N.W.2d at 158). The parent requesting the change must also prove "an ability to minister more effectively to the children's well-being." *Id.* (quoting *Frederici*, 338 N.W.2d at 158); *see also Thielges*, 623 N.W.2d at 235. Our courts have concluded in order to promote stability in children's lives, "once custody of children has been fixed it should be disturbed only for the most cogent reasons." *Id.* (quoting *Frederici*, 338 N.W.2d at 158); *see also Dale v. Pearson*, 555 N.W.2d 243, 245 (Iowa Ct. App. 1996).

Martin has failed to meet his "heavy burden." As set forth above, Martin is the primary cause of the conflict between the parents and is not supportive of the therapy necessary to address K.C.'s mental health condition. The same considerations that lead us to conclude Rebekah should have sole legal custody of the children also lead us to conclude Rebekah and not Martin should have physical care of the children. Martin does not present the best environment to raise K.C. and J.C. to bring them to mental and physical health.

Rebekah seeks an award of appellate attorney fees. We have the discretion to make an award of appellate attorney fees. *See In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007) (citing *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997)). The court will "consider the needs of the party making the request, the ability of the other party to pay, and whether

the party was required to defend the district court's decision on appeal." *Id.* We decline to award appellate attorney fees in this case.

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**