# IN THE COURT OF APPEALS OF IOWA

No. 19-1587
Filed August 19, 2020

IN RE THE MARRIAGE OF RICARDO NAVARRO
AND CATHERINE NAVARRO

Upon the Petition of
**RICARDO NAVARRO,**
        Petitioner-Appellant,

**And Concerning**
**CATHERINE NAVARRO, n/k/a CATHERINE BROWN,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Mills County, Michael D. Hooper,

Judge.


        Ricardo Navarro appeals the denial of his petition to modify the physical

care provisions of a dissolution-of-marriage decree. **REVERSED AND**

**REMANDED WITH INSTRUCTIONS.**


        Jaclyn A. Tackett of Jaci Tackett Law PLLC, Council Bluffs, for appellant.

        Dawn M. Landon of Sell Law, PLC, Glenwood, for appellee.


        Considered by Vaitheswaran, P.J., and Mullins and Ahlers, JJ.

**MULLINS, Judge.**

Ricardo Navarro appeals the district court's denial of his petition to modify the physical care provisions of the decree dissolving his marriage to Catherine Navarro, now known as Catherine Brown. He claims the district court improperly relied on the juvenile court's permanency goal in a child-in-need-of-assistance (CINA) proceeding of reunifying the parties' child with Catherine in concluding he could not provide superior care. He alternatively argues the court erred in concluding he did not meet his burden to show he could provide superior care.

## I.    Background Facts and Proceedings

The parties married in 2013. Domestic violence was present in the relationship, and the parties separated. Ricardo was convicted of multiple crimes stemming from domestic violence in the relationship. He has since completed counseling courses relative to cognitive restructuring, coping with anxiety, domestic violence, and anger management. Catherine learned she was pregnant after the separation. The child was born in 2014. Ricardo did not learn of the child's existence until more than one year later. The marriage was ultimately dissolved in 2015. The parties were awarded joint legal custody with physical care to Catherine and visitation to Ricardo. Because Ricardo lived several hours from Catherine,[1] the court ordered his visitation to be limited to every other Saturday from 11:00 a.m. to 4:00 p.m. Upon his substantial compliance with attending visits and completion of a batterer's education program, his visitation would increase to

---

[1] Ricardo lived in western Illinois, and Catherine lived in western Iowa.

every other weekend, from Friday afternoon to Sunday evening. Ricardo satisfied those conditions in March 2016, and his visitation was increased.

In late 2016, Ricardo was arrested on a warrant. Thereafter, he served roughly five months in jail before the charges were dismissed. According to his testimony, after he got out of jail, he was unable to exercise visitation with the child because Catherine refused to communicate with him and he did not know where the child was. There was also a no-contact order in place between Ricardo and Catherine between December 2016 and December 2017. Also in late 2016, Catherine was charged with child endangerment as to the child in interest. She pled guilty, received a deferred judgment, and was placed on informal probation, which she discharged in February 2018.

In May 2018, the Iowa Department of Human Services (DHS) received allegations Catherine was using methamphetamine, heroin, and opiates while caring for the child. DHS met with the child's maternal grandmother, who reported "she had been taking care of [the child] a lot since Catherine 'started having problems' in October 2016." Upon the evidence we find credible, we conclude the child was essentially living with the grandmother. A safety plan was established, pursuant to which the child would remain in the grandmother's care. The mother underwent drug testing and tested positive for morphine and a heroin metabolite. Ricardo testified he was largely unable to exercise his visitation with the child until DHS intervention. The State petitioned for adjudication of the child as a CINA. Thereafter, the State sought and obtained a formal order for temporary removal and placement of the child with the grandmother. The child was adjudicated CINA in August.

An Interstate Compact on the Placement of Children (ICPC) study was completed as to Ricardo's home in September. It was recommended that the child be placed with him. By October, each of the parents had been exercising regular visitation with the child. At a dispositional hearing that month, Catherine challenged the accuracy and thoroughness of the ICPC study. The court agreed that some of Ricardo's criminal history was omitted from the study and may be pertinent to the evaluation. Ricardo requested that the child be placed in his care and that the juvenile court grant the district court concurrent jurisdiction to allow him to pursue a change of custody in the district court. Given the mother's progress toward reunification and the court's concerns for the ICPC study, the juvenile court denied Ricardo's requests.

In December, Ricardo filed a motion for an emergency hearing on placement and concurrent jurisdiction, citing Catherine and the grandmother's efforts to alienate the child from Ricardo. DHS investigated the matter and essentially learned the child did not want to have visitation with Ricardo, which was largely a result of Catherine and the grandmother saying negative things about Ricardo to the child, including that he does not love her. The child's guardian ad litem met with the child, who reported Catherine and the grandmother told her to say, "My daddy hits me on the head and my forehead." The grandmother also made allegations of sexual abuse of the child against Ricardo. The child underwent a forensic interview and physical examination. There was nothing to substantiate the claims of physical or sexual abuse. Illinois law enforcement declined to pursue criminal charges. The permanency goal remained reunification with Catherine, but her visitation was reverted to fully supervised.

In March 2019, the juvenile court granted Ricardo's motion for concurrent jurisdiction in the district court. Shortly thereafter, Ricardo filed a petition to modify the custodial provisions of the parties' dissolution decree. Sometime thereafter, Catherine progressed to semi-supervised visitation. By May, Catherine progressed to unsupervised and overnight visitation with the child. Following a review hearing the same month, the permanency goal remained reunification with Catherine. Then, in early June, according the testimony of the child's guardian ad litem (GAL), things began to unravel again. According to the GAL, Catherine reinitiated her campaign of talking negatively about Ricardo, and the child again began exhibiting disinterest in spending time with him.

The modification matter proceeded to hearing in July. In its ensuing ruling, the court concluded a substantial and material change in circumstances had occurred since the entry of the dissolution decree. However, the court was not convinced Ricardo proved a superior ability to more effectively minister to the child's well-being. The court denied Ricardo's modification petition on that basis and this appeal followed.[2]

## II.    Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, which we review de novo. Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). The best interests of the

---

[2] Catherine did not file a brief in this appeal.

child is our primary consideration.  Iowa R. App. P. 6.904(3)(o); *Hoffman*, 867 N.W.2d at 32.

## III.    Analysis

On appeal, Ricardo claims the district court improperly relied on the juvenile court's permanency goal in the CINA proceeding of reunifying the child with Catherine in concluding he could not provide superior care.  He alternatively argues the court erred in concluding he did not meet his burden to show he could provide superior care.  We simply consider whether Ricardo met his burden to provide superior care.

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the child[ ]'s best interests make it expedient to make the requested change.  The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.  They must relate to the welfare of the child[ ].  A parent seeking to take custody from the other must prove an ability to minister more effectively to the child[ ]'s well being.  The heavy burden upon a party seeking to modify custody stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

The district court concluded Ricardo met his burden to prove a material and substantial change in circumstances since the entry of the dissolution decree. Because that conclusion is not challenged by Catherine, we do not disturb it.  We turn to whether Ricardo met his burden to show he has a superior ability to minister to the child's well-being.  *See In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016); *Frederici*, 338 N.W.2d at 158.  Our primary consideration in making this determination is the long-term best interests of the child.  *See In re Marriage of*

*Zabecki*, 389 N.W.2d 396, 395 (Iowa 1986). "Prior cases are of little precedential value, except to provide a framework for our analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us." *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995).

The criteria for determining child custody are applied in both dissolution and modification proceedings. *See In re Marriage of Hubbard*, 315 N.W.2d 75, 80 (Iowa 1982); *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996). "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)" (2019). *Courtade*, 560 N.W.2d at 37. "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care. *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). "In determining which parent serves the child's best interests, the objective is to place the child in an environment most likely to bring the child to healthy physical, mental, and social maturity." *Courtade*, 560 N.W.2d at 38. The following factors are relevant to the determination of which parent can more effectively minister to the child's long-term well-being in this case:

> (a) Whether each parent would be a suitable custodian for the child.
> (b) Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> (c) Whether the parents can communicate with each other regarding the child's needs.
> (d) Whether both parents have actively cared for the child before and since the [decree].
> (e) Whether each parent can support the other parent's relationship with the child.
> . . . .
> (h) The geographic proximity of the parents.

. . . .
      (j) Whether a history of domestic abuse . . . exists. . . .
. . . .

Iowa Code § 598.41(3)(a)–(e), (g), (h), (j).[3]

We first consider "[w]hether the parties would be suitable custodians for the child." *Id.* § 598.41(3)(a). Both parties have physical limitations that prevent them from doing regular activities with a five-year old child. The child reported to the GAL that, when she is with Catherine, "her mom can't do much and she sits kind of in a chair and watches TV." The child reported Ricardo takes her outside a lot and to the park, which she loves. The GAL also noted her concern for the disparity in the parties' employment circumstances, with Catherine being unemployed throughout the CINA proceeding, while Ricardo maintained a full-time job. We have no concerns for Ricardo's suitability as a custodian. Catherine on the other hand, has a recent history of instability in her ability to serve as a suitable custodian. The maternal grandmother has largely carried the load for Catherine. We find this factor weighs in favor of Ricardo.

We turn to "[w]hether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents." *Id.* § 598.41(3)(b). The child is bonded to both parents and will suffer regardless of which parent has physical care. Upon our de novo review, we determine this factor to be a wash.

---

[3] We also note our consideration of the characteristics of the child and parents, the child's needs and the parents' capacity and interests in meeting the same, the relationships between the parents and child, the effect of continuing or disrupting an existing physical care arrangement, the nature of each proposed environment, and any other relevant matter disclosed by the evidence. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).

Next, we consider "[w]hether the parents can communicate with each other regarding the child's needs." *Id.* § 498.41(3)(c). We have no concerns for Ricardo's abilities on this point. We hold concerns for Catherine's ability to communicate with Ricardo. We find Ricardo's lack of involvement in the child's life prior to DHS intervention to largely be a result of Catherine's refusal to communicate with him. This factor also weighs in favor of Ricardo.

We turn to "[w]hether both parents have actively cared for the child before and since the [decree]." *Id.* § 598.41(3)(d). Only Catherine actively cared for the child before the entry of the dissolution decree in November 2015. She continued to do so for a year thereafter, with the help of the grandmother. But, in late 2016, the grandmother began actively caring for the child while Catherine was less involved. This dynamic continued until DHS intervention in May 2018. Thereafter, both parents exercised visitation, but the grandmother continued as the active caregiver. We determine this factor to weigh in favor of Catherine, but only slightly given her lack of caregiving for the last few years.

We next consider "[w]hether each parent can support the other parent's relationship with the child." *Id.* § 598.41(3)(e). The GAL testified she would have no ongoing concerns about Ricardo preventing the child's contact with Catherine if he were the primary care parent. She stated she would have ongoing concerns about Catherine preventing the child's contact with Ricardo if modification did not occur. We agree with the GAL's assessment. Catherine and her mother have campaigned against Ricardo. They have said negative things about Ricardo to the child, which affected the child's desire to spend time with Ricardo and unquestionably damaged their relationship. While things got better when

Catherine's visitation reverted to fully supervised, the dynamic reemerged shortly before the modification trial, when Catherine was allowed unsupervised visits. This factor unquestionably weighs in favor of Ricardo.

Without question, the geographic proximity of the parents is problematic. *See id.* § 598.41(3)(j). As it has in the past, it will continue to result in difficulties with visitation for the non-physical-care parent. Either way, the child will be required to spend long amounts of time traveling to see her parents. We do not find this factor to weigh in favor of either parent.

It is true a history of domestic abuse exists in the parties' relationship, with Ricardo being the perpetrator. *See id.* § 598.41(3)(j). While we do not condone that history, Ricardo has since completed counseling courses relative to cognitive restructuring, coping with anxiety, domestic violence, and anger management. And, when asked if she had concerns with the child being placed in Ricardo's physical care, the GAL testified as follows:

> No. Ricardo's done everything that the department has asked of him. He comes, he drives all the way from Illinois despite sometimes not getting the child. And any services or recommendations that he was asked to do, whether ordered or not, it's my understanding he's done those, and I've seen the proofs to show that he's done those.

We do find this factor to weigh in favor of Catherine, but only slightly given Ricardo's meaningful steps toward reformation.

Unfortunately, "[d]etermining what custodial arrangement will best serve the long-range interest of a child frequently becomes a matter of choosing the least detrimental available alternative for safeguarding the child's growth and development." *Winter*, 223 N.W.2d at 167. While both parents share a bond with the child, and there is a potential for a negative effect on the child resulting from a

disruption of the existing arrangement, we conclude, based on the parties' characteristics, Ricardo has a superior capacity and interest in meeting the child's needs and placement in his physical care is in her best interests. *See id.* at 166–67. We hold absolutely no concerns for the child's well-being if placed in Ricardo's physical care. As to Catherine, we share the GAL's concern that, based on past behavior, if the child were returned to her care, it would only be a matter of time before re-involvement of the juvenile court. Upon our de novo review of the record and considering the statutory and *Winter* factors, we find Ricardo met his burden to show he has a superior ability to minister most effectively to the child's well-being. We commend Catherine for the progress she has made, but conclude placement of the child in Ricardo's physical care is "most likely to bring the child to healthy physical, mental, and social maturity." *See Courtade*, 560 N.W.2d at 38.

## IV. Conclusion

We reverse the district court's denial of Ricardo's petition to modify the physical care provisions of the decree. We remand the matter to the district court for establishment of a visitation schedule, determination of child support, and consideration of any ancillary matters based upon the parties' present circumstances. *See Harris*, 877 N.W.2d at 445.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**