# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1216
Filed May 13, 2026

———————————

**In re the Marriage of Arthur James Cleary and Angelica Cleary Andrade**

Upon the Petition of
**Arthur James Cleary,**
Petitioner–Appellant,

And Concerning
**Angelica Cleary Andrade, n/k/a Angelica Andrade Ponce,**
Respondent–Appellee.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Michael D. Huppert, Judge.

———————————

**AFFIRMED**

———————————

Colin McCormack of Van Cleaf & McCormack Law Firm, LLP, Des
Moines, attorney for appellant.

Sandra E. Suarez of Suarez Law Firm, Des Moines, attorney for appellee.

———————————

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

Arthur Cleary appeals the district court's order granting Angelica Andrade sole legal custody and physical care of their shared child. Arthur also appeals the district court's decision to assign him the loan debt associated with OneMain Financial. Angelica requests appellate attorney fees. For the reasons stated below, we affirm the district court's order and award appellate attorney fees to Angelica.

## BACKGROUND FACTS AND PROCEEDINGS

Arthur and Angelica[1] married in July 2016. The parties had one child together during their marriage. Their child, L.C.A., was born in 2017 and would later be diagnosed with autism spectrum disorder. The parties moved in with Angelica's family in 2015 until they moved to Bondurant with L.C.A. in 2022. The parties separated in May 2023. Arthur continues to live at the Bondurant address while Angelica has moved back in with her family in Des Moines. Nine people live in Angelica's family home: Angelica and L.C.A., Angelica's parents, Angelica's sister, and her sister's family. Angelica and L.C.A. share a bedroom but have separate beds, and nothing in the record indicates Angelica's family home is in any way inadequate for L.C.A.

Before the parties separated, Arthur had a good relationship with Angelica's family. But that relationship deteriorated quickly when they separated. Visitation exchanges between Arthur and Angelica have been contentious. Two videos from 2024 were shown at trial as examples of the conflict between the parties at visitation exchanges. In an October exchange, Arthur moved his car behind Angelica's car and refused to allow her to leave

---

[1] Part of the district court's order restored Angelica Andrade's original birthname.

a parking lot. He said it was because L.C.A. refused to buckle her seat belt and escalated into both parties yelling at one another until Angelica called the police.[2]

During a different exchange in December at a gas station, Arthur was supposed to hand L.C.A. over to Angelica. Arthur instead tried to take L.C.A. with him into a combined Starbucks and gas station convenience store to avoid Angelica but could not get inside as both stores were closed. Arthur then brought the child to Angelica's car but attempted to access her vehicle's glove box without her permission. Angelica told Arthur to stop, and the two started grabbing each other's arms. This altercation became the basis for a temporary protective order Angelica obtained a few days later. The consent decree issued by the district court stated the parties (1) shall have no contact for one year; (2) shall use the Talking Parents application and limit their communication only to issues involving L.C.A.; and (3) all visitation exchanges shall take place at the Altoona Police Department with limits on who could participate in the exchanges.

Another pivotal incident occurred in April 2025, when Arthur picked the child up from school and took her to a medical appointment. It was not, however, his scheduled time to be with L.C.A. Both Arthur and Angelica attended the medical appointment. When leaving the hospital, Arthur took Angelica's car for several hours while leaving his own car in the parking lot. This, in effect, stranded Angelica and L.C.A. at the hospital until Angelica's friend picked them up later that evening. Arthur returned later to get his own car but never returned Angelica's car. Angelica's purse and personal belongings in her car were eventually returned to her, but Arthur still retains control of her car. Arthur disputes this version of events and claims he had

---

[2] The record does not reflect that any report from this incident was filed.

the right to take the vehicle because he and Angelica were "co-owners." When asked more precise questions about the event at trial, Arthur "took the Fifth" and refused to answer any questions.

At trial, the district court judge granted Angelica sole legal custody and physical care of L.C.A. and gave visitation rights to Arthur. The district court also assigned the debt associated with a loan from OneMain Financial to Arthur. Arthur now appeals.

## STANDARD OF REVIEW

"Dissolution of marriage actions are reviewed de novo." *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021). In child custody matters, "our review is de novo and our primary consideration is the best interest of the child." *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995). While we are not bound by the district court's findings, we give them weight, especially concerning witness credibility. *Towne*, 966 N.W.2d at 674. We only disturb the district court's ruling if the ruling fails to do equity. *Id.*

## DISCUSSION

### I.    Legal Custody and Physical Care

Arthur argues he should be granted sole legal custody and physical care of L.C.A. Both parties requested sole legal custody and physical care of the child, with the other party receiving visitation rights. Neither party requested joint legal custody.

If the court declines to grant joint legal custody, it "shall cite clear and convincing evidence, pursuant to the factors in [Iowa Code section 598.41(3)], that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child

and a parent should be severed." Iowa Code § 598.41(2)(b) (2025). While section 598.41(3) provides a list of factors we "shall consider" to determine a proper custody arrangement, the statute requires us to consider only the factors that are relevant to the specific case before us. *See In re Marriage of Liebich*, 547 N.W.2d 844, 848 (Iowa Ct. App. 1996); *In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009).

After our de novo review, we conclude joint legal custody is not in the child's best interests, and Angelica should have sole legal custody and physical care of L.C.A. In making this determination, we consider the following relevant factors under section 598.41(3): (a) whether each parent would be a suitable custodian for L.C.A.; (b) whether the psychological and emotional needs and development of L.C.A. will suffer due to lack of active contact and attention from both parents; (c) whether the parents can communicate with each other regarding L.C.A.'s needs; (d) whether both parents have actively cared for L.C.A. before and since the separation; (e) whether each parent can support the other parent's relationship with L.C.A.; and (g) whether one or both parents agree or are opposed to joint custody. *See* Iowa Code § 598.41(3)(a)–(e), (g).

Joint legal custody is not workable, and both parents are opposed to it. *See id.* § 598.41(3)(g). The record reflects that Arthur and Angelica are consistently unable to communicate productively regarding L.C.A.'s best interests. Personal conflict between the parents prevents them from effectively making decisions regarding the child's health and day-to-day life. This is particularly important for this child given her diagnoses. The district court determined that many of the communication issues between the parents are due primarily to Arthur's actions and behavior. Giving due deference to the district court, we find no reason to disturb that finding.

Arthur refused to use the Talking Parents application, which was the only method afforded to the parties to communicate about L.C.A. *See id*. § 598.41(3)(c). Arthur enrolled the child in a new school district without consulting Angelica. *See id*. The record reflects that Arthur is openly hostile to Angelica and her family regarding their undocumented status. While raising his concerns about members of Angelica's undocumented family potentially driving L.C.A. without a valid driver's license, he consistently referred to them as Angelica's "illegal family" throughout the trial. *See id*. § 598.41(3)(e). Angelica testified at trial that she and her family fear that Arthur may get immigration officials involved and attempt to have Angelica and undocumented members of her family deported.[3] *See id*. Further, the district court found that Arthur's "overall attitude also strongly suggests that he does not support an ongoing relationship between [Angelica] and the child." *See id*.

Arthur's other actions show he is willing to act against Angelica to the detriment of the child—like when he took Angelica's car without permission at the doctor's appointment and effectively stranded Angelica and L.C.A. at the hospital. *See id*. § 598.41(3)(a), (c), (d), (e). Another example is the visitation exchange in the convenience store parking lot where Arthur refused to let Angelica leave by parking his car behind hers. Or the handoff that ended in a brief physical altercation when Arthur tried to go through Angelica's glove box without permission. *See id*. § 598.41(3)(c).

There is also the issue of L.C.A.'s autism diagnosis and treatment. Arthur has been less involved in the effort to obtain proper therapies and treatment for L.C.A., largely because he disagrees with the medical

---

[3] Angelica testified at trial that if she and her family were ever deported, Angelica's adult niece (who is a United States citizen) would take care of L.C.A.

professionals' conclusions that the child needs prescribed therapies for treatment. *See id.* § 598.41(3)(b). Instead, Arthur believes the child needs only to engage in more activities to achieve better "socialization." This is squarely against the medical advice given to the parents that Angelica is following for L.C.A., and we agree with the district court's conclusion "that if [Arthur] were afforded the sole responsibility for the child's medical needs, much if not all of the progress made up to now would be squandered." *See id.* § 598.41(3)(b), (c).

We do not doubt that Arthur loves L.C.A. *See id.* § 598.41(3)(d). But given his behavior and attitude, the intense conflict and inability to communicate between the parties, and the district court's credibility determinations, the order giving Angelica sole legal custody and physical care serves the best interests of the child. We decline to disturb it and therefore affirm.

## II.    OneMain Financial Loan

Arthur argues that the district court erred by assigning him the OneMain Financial loan. Angelica argues this issue is not properly preserved for our review because Arthur failed to file a subsequent motion under Iowa Rule of Civil Procedure 1.904(2) or an application for *nunc pro tunc*. But such a motion is only required to preserve error if the district court failed to rule on an issue presented to it. *See Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002). It its order, the district court assigned the OneMain Financial loan debt to Arthur. The issue is thus preserved.

Yet, Arthur fails to cite any applicable law in his brief as to why the debt should be reassigned to Angelica or how the district court's assignment failed to do equity. He instead argues that because Angelica testified at trial that the OneMain Financial loan belonged to her and that she was willing to

keep the debt, the district court's order assigning the debt to Arthur was possibly a scrivener's error. Iowa Rule of Appellate Procedure 6.903(2)(a)(8)(3) provides that "[f]ailure to cite authority in support of an issue may be deemed waiver of that issue." Because Arthur fails to cite any applicable authority in support of his argument, we deem the issue waived.

## III. Appellate Attorney Fees

Angelica argues she is entitled to appellate attorney fees in this case. "Appellate attorney fees are not a matter of right, but rather rest in [our] court's discretion." *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (citation omitted). In making this determination, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up).

Given the merits of the appeal and the income disparity between the parties, we conclude Angelica is entitled to reasonable appellate attorney fees. Angelica submitted an affidavit requesting $5,400 in appellate attorney fees. We thus award Angelica $5,400 in appellate attorney fees.

**AFFIRMED.**