# IN THE COURT OF APPEALS OF IOWA

No. 18-0783
Filed February 20, 2019

IN RE THE MARRIAGE OF JOSHUA RYAN STICE
AND CHRISTINA INEZ STICE

Upon the Petition of
JOSHUA RYAN STICE,
     Petitioner-Appellee,

And Concerning
CHRISTINA INEZ STICE n/k/a CHRISTINA INEZ ADAMS,
     Respondent-Appellant.
_____

     Appeal from the Iowa District Court for Polk County, Thomas P. Murphy, Judge.

     A mother appeals the modification of physical care provisions of a decree of dissolution. **AFFIRMED.**

     Patrick W. O'Bryan of O'Bryan Law Firm, Des Moines, for appellant.

     Lucas W. Otto of Otto Law Office, PLLC, Newton, for appellee.

     Considered by Tabor, P.J., and Mullins and Bower, JJ.

**TABOR, Presiding Judge.**

Christina Adams and Joshua Stice are the parents of G.S. The decree dissolving their marriage granted them joint legal custody and placed physical care with Christina. Four years later, Joshua sought modification, and the district court placed physical care of seven-year-old G.S. with him. Christina appeals. Because Joshua demonstrated Christina's failure to support his relationship with G.S. required a change in the care arrangement, we affirm.

## I.      Facts and Prior Proceedings.

Christina and Joshua were married in 2010, had G.S. in 2011, and divorced in 2013. After the divorce, Joshua met and married Ashland; they have an infant daughter, and Ashland has another daughter close to G.S.'s age. They live together in the Des Moines area. Christina moved to Missouri and then to Keokuk. In addition to G.S., Christina's household includes her two older school-aged daughters from another relationship; her fiancé, Jason; and his eighteen-year-old son. By all accounts, G.S. gets along well with all her half- and step-siblings.

Shortly after the divorce, Christina began violating the terms of the decree—including denying Joshua parenting time and failing to communicate effectively with him about G.S. For instance, for several years, Joshua and Christina agreed to perform custody exchanges in Batavia, Iowa, about ninety minutes from both their homes. On many occasions, Christina canceled visitation immediately before the exchange when Joshua was already in Batavia or on his way. Three times, Christina did not show up for the exchange. On several Fridays, when Joshua planned to pick up G.S., Christina told him G.S. was too sick for his weekend visitation, that the day care called, and G.S. needed to go to the doctor. But when

Joshua obtained the medical records, G.S. had not been to the doctor on those days.  Christina also failed to tell Joshua the daycare was closed on Fridays.

Joshua occasionally requested flexibility in the visitation schedule to accommodate his duties as an Army reservist.  But Christina generally refused to compromise.  Even when Joshua offered to drive all the way to Keokuk to pick up G.S., Christina often declined.  Christina testified she has a busy work schedule and some family medical emergencies prevented Joshua from receiving all his visitation. But she also admitted many times she did not tell him the true reason for cancelling.

At the hearing, Joshua complained about Christina's lack of communication; phone calls and texts often went unanswered.  Once, Christina did not communicate with Joshua about G.S. for three weeks, during which she denied all his scheduled visitation.  In summer 2017, Christina did not let Joshua see G.S. for seven weeks.  She also refused Joshua phone contact during that time.

Christina's failure to communicate extended to G.S.'s health care.  Christina did not provide Joshua notice of medical appointments or share paperwork with him following those appointments.  Christina did not document Joshua as a parent in G.S.'s medical records or report insurance information accurately so Joshua ended up bearing additional medical expenses.  For four or five months in 2017, Christina told Joshua G.S. was seeing a counselor and the department of human services was involved.  Christina admitted at trial neither assertion was true.

Education issues were no better.  Just three weeks before the modification hearing, Joshua learned Christina had enrolled G.S. in a new school without notifying him or listing him as a parent.

The parents also clashed over having phone calls with G.S. outside their scheduled parenting time. The parents had agreed to a schedule of calls from Joshua on Tuesday and Thursday nights, and both parents receiving calls on the Saturday G.S. was not in their care. Calls were to take place at 6:00 p.m. but most of Joshua's calls went unanswered or were cut short. Christina testified G.S. loses interest in talking on the phone and does not like going to her dad's for visitation. But Christina also admitted she told G.S. that Joshua was asking for physical care and trying to put Christina "in jail" for not complying with court orders.

To enforce his visitation, Joshua had to resort to contempt actions. In January 2014, on Joshua's petition, the court held Christina in contempt for withholding visitation on thirty-five occasions. The court ordered her to give Joshua make-up visits. In January 2018, the court again held Christina in contempt[1] for denying Joshua his scheduled parenting time including six overnight visits; failing to inform Joshua of medical appointments and where G.S. was enrolled in school; and incurring unnecessary medical expenses by failing to use G.S.'s insurance card. The court ordered Christina to serve thirty days in the county jail and make up the missed visitation.[2]

After repeatedly pursuing contempt as a remedy, Joshua filed this modification petition requesting physical care. The court held a modification hearing—admitting into evidence many exhibits, including text message logs, police logs, medical records, school attendance records, journals from both

---

[1] Although the court entered one order, it stemmed from Joshua's two separate petitions for rule to show cause for various violations of the decree over many months.
[2] Christina failed to appear at the hearing, and the court entered a default order.

parents recording their visitations and interactions, phone call logs, and other relevant information.  Both parents testified.

At the close of the hearing, the court made the following statement:

> I am concerned that a move will be traumatic for [G.S.]  I am concerned if she moves she will miss her siblings.  I am more concerned that [G.S.] is not having frequent and regular contact with her father and that is not encouraged.  She needs both of her parents.  I do believe that her father is going to support a relationship with you [Christina] more than you support a relationship with [G.S.'s] father.
> I think it is in [G.S.'s] best interest and the Court's finding that we are going to award primary care to Mr. Stice.  You will have very liberal visitation, every other weekend.

The court established a new visitation schedule for Christina and implored both parents to cooperate in their child's interest.  Christina appeals the modification.

## II.      Standard of Review

We review rulings on motions to modify dissolution decrees de novo.  Iowa R. App. P. 6.907; *In re Marriage of Beecher*, 582 N.W.2d 510, 512 (Iowa 1998).  "We examine the entire record and adjudicate anew rights on the issues properly presented."  *Beecher*, 582 N.W.2d at 512–13.  "We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them."  *Id.* at 513.

Our primary concern is G.S's best interests.  *See In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007).  When determining physical care, we are guided by the factors established in Iowa Code section 598.41(3) (2017) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010).  But because each family presents its own

strengths and challenges, we base our determination on the circumstances of each case. *See In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995).

**III.    Analysis**

Joshua must show by a preponderance of the evidence modification of the physical care arrangement is appropriate. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We apply a two-pronged test. First, Joshua must show conditions since entry of the decree have materially and substantially changed such that it is fitting to request the modification, and the changes were not contemplated by the court when entering the decree, are more or less permanent, and relate to G.S.'s welfare. *See id.* And second, Joshua must show his ability to offer superior care. *See In re Marriage of Mayfield*, 577 N.W.2d 872, 873 (Iowa Ct. App. 1998)). "The burden is necessarily a heavy one undergirding the fundamental policy that 'once custody of children has been fixed it should be disturbed only for the most cogent reasons.'" *Hoffman*, 867 N.W.2d at 32 (quoting *In re Marriage of Federici*, 338 N.W.2d 156, 160 (Iowa 1983)).

**A.  Substantial Change in Circumstances.**

When deciding what physical care arrangement will be in G.S.'s best interests, we consider, among other factors, "the ability of the spouses to communicate and show mutual respect." *In re Marriage of Hansen*, 733 N.W.2d 683, 698 (Iowa 2007). This factor loomed large in the district court's description of the substantial change in circumstances justifying modification of the decree:

> Christina failed, and even refused, to keep Joshua informed about [G.S.'s] activities, Joshua was often unaware of [G.S.'s] medical providers, and he was kept in the dark regarding school enrollment. For months, Christina deliberately and falsely led

Joshua to believe [G.S.] was seeing a counselor related to [G.S.'s] relationship with Joshua.

The district court further discussed Christina's lack of respect for Joshua when navigating the visitation exchanges:

> The parties had agreed to meet halfway between their locations to exchange [G.S.] on visitations. Often, Christina would tell Joshua after he was already traveling to the halfway point, or when he was already there, that she was working overtime and could not meet him.
> . . . Joshua would text or call Christina about [G.S.] . . . . His texts or calls often went unanswered and unreturned . . . .
> Although the court believes that at times, Christina's work schedule interfered with visitation exchanges, it seems more often than not that Christina simply refused to comply with ordered, or agreed-upon, visitation.

The district court questioned Christina's credibility.

> When questioned about her behavior, Christina offered excuses, was evasive, and at times untruthful. When pushed, in several parts of her testimony, Christina admitted to withholding visits (and lying about the reasons) but said she made "mistakes," that she and Joshua need to communicate better, or that she received bad advice from prior attorneys. Christina suggested that she has learned her lesson and will change. However, even being sentenced to jail in January 2018, Christina did not make a reasonable attempt to provide ordered make-up visits and she withheld an Easter weekend visit between [G.S.] and Joshua (knowing the modification trial was just around the corner.)

We have carefully reviewed the parties' trial exhibits, testimony, and counsel's arguments and—giving proper deference to the district court's credibility determinations—we agree Joshua showed substantially changed circumstances. Christina's continual interference with his relationship with G.S. emerges as a cogent reason to transfer physical care. As Joshua explained at the trial, rather than filing successive contempt actions, the best way to deal with Christina's

intransigence is to modify the care arrangement. We find modification to be justified here.

### B. Ability to Offer Superior Care.

Joshua next must show his ability to offer G.S. superior care. Christina argues the district court did not make an express finding that Joshua could offer superior care. We agree the district court's ruling could be clearer, but its findings of fact and conclusions of law are definitive that—in light of Christina's undermining conduct—Joshua would now be the superior primary caregiver. The court rejected Christina's prediction that "a move to Joshua's house will be 'devastating' to [G.S.]" Instead, the court found it would be "devastating for [G.S.] to primarily stay at Christina's house and have repeated interference with visitations with Joshua, which whom [G.S.] should have maximum exposure . . . . [T]he court finds that it is in [G.S.'s] best interests to have Joshua become her primary physical caretaker."

Each parent's ability to support the other parent's relationship with the child is a key factor in deciding physical care. *See* Iowa Code § 598.41(3)(e). "Discord between parents that has a disruptive effect" on a child's life can warrant a change in the physical care arrangement if by enacting the change the child "will have superior care." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002).

In this case, both parents are capable of maintaining an appropriate home environment and meeting G.S.'s material and nurturing needs. But Joshua established he will be a better physical-care custodian. Joshua has exercised patience with Christina's interference and consistently worked to maintain contact with his daughter despite obstacles thrown in his way. We agree with the district court that Christina has placed G.S. in the middle of her conflict with Joshua by

discussing the contempt and modification proceedings with the child. These inappropriate disclosures have had a detrimental impact on G.S.'s relationship with her father. By contrast, Joshua has shown he is more willing to support Christina's relationship with G.S. He has not exposed G.S. to inappropriate discussions about these proceedings or disparaged Christina to G.S.

On a final point, we appreciate Christina's concern that a change in physical care will unsettle G.S. and impact the strong bond the child enjoys with her two half-sisters. See *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) (expressing preference for keeping siblings together). But we note that G.S. also has a half-sibling and step-sibling in Joshua's home. Christina complains the district court focused too much on the turmoil between her and Joshua and her past conduct; but her past conduct is the catalyst for the change in the care arrangements. The district court properly ordered liberal visitation for Christina.

We affirm the modification.

**AFFIRMED.**